```
1              IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF TENNESSEE
2                      NORTHERN DIVISION

3
  UNITED STATES OF AMERICA        )
4                                 )
                    Plaintiffs,   )
5                                 )
  vs.                             )  No. 2:17-CR-00012
6                                 )  Greeneville, Tennessee
  JONATHAN ANDY LOGAN DISHNER     )  May 30, 2018
7                                 )  1:30 p.m.
                    Defendant.    )
8  _____

9
                  TRANSCRIPT OF PROCEEDINGS
10          BEFORE THE HONORABLE J. RONNIE GREER
                UNITED STATES DISTRICT JUDGE
11                      May 30, 2018

12 _____

13 APPEARANCES:

14 For the Plaintiff:        J. GREGORY BOWMAN, ESQ.
                            U.S. Dept of Justice
15                          Office of U.S. Attorney
                            230 West Depot Street
16                          Suite 423
                            Greeneville, TN  37743
17

18 For the Defendant:        JERRY J. FABUS, JR., ESQ.
                            Law Office of Jerry J. Fabus, Jr.
19                          4136 Bristol Highway, Suite 1
                            Johnson City, TN  37601
20

21
   _____
22
             Jill M. Waggoner Zobel, LCR #692
23              Miller & Miller Court Reporters
            12804 Union Road, Knoxville, TN 37934
24        Phone: (865) 675-1471 / Fax: (865) 675-6398
                    Email: JMccon@aol.com
25
```

1                          INDEX

2    WITNESS                                          PAGE

3    WITNESSES FOR THE DEFENDANT

4    JONATHAN ANDY LOGAN DISHNER
             Direct Examination by Mr. Fabus          4
5            Cross Examination by Mr. Bowman          12
             Examination by the Court                 42
6            Cross Examination – Continued by Mr. Bowman  48
             Redirect Examination by Mr. Fabus        62
7            Further Examination by the Court         63

8

     WITNESSES FOR THE PLAINTIFF
9
     SHANNON RUSSELL
Direct Examination by Mr. Bowman         76

11   CLOSING ARGUMENT BY MR. FABUS                    86

12   CLOSING ARGUMENT BY MR. BOWMAN                   94

13

      (NOTE:  Unless provided to the Court Reporter, all proper
14     nouns are rendered to the best phonetic approximation.)

15

16                    INDEX OF EXHIBITS

17   NO.  DESCRIPTION                                PAGE

18   1    Agent Russell's Case Statement             85

19
                  (All Exhibits filed with the Court.)
20

21

22

23

24

25

          This cause came on for hearing on the 30th day of

May, 2018, in the United States District Court for the

Eastern District of Tennessee, Northern Division, before the

Honorable J. Ronnie Greer, presiding.

          The Court having duly opened, the following

proceedings were had, to wit:

          THE COURT:  Ms. Cassanego, would you call the next

case, please.

          THE COURTROOM DEPUTY:  Yes, Your Honor.  Criminal

action 2:17-CR-12, United States of America versus Jonathan

Andy Logan Dishner.

          THE COURT:  All right.  Mr. Dishner has filed a

Motion in this case seeking to withdraw his guilty plea and

proceed to trial in the case.

          The Motion has been briefed by both Parties and

the purpose of today's hearing is to allow any evidence that

might need to be heard by the Court to be introduced.

          Mr. Fabus, how many witnesses do you intend to

call?

          MR. FABUS:  I wasn't sure how you would proceed on

that.  Is there not going to be any oral argument?  This is

just an evidentiary hearing?

          THE COURT:  Well, I want to hear everything there

is to hear before I hear oral argument.

          MR. FABUS:  Okay.  I wasn't sure how you would

```
 1   proceed.  If you would just question him yourself -- I
 2   didn't necessarily want to put him on the stand myself and
 3   then allow him to be subject to cross by Mr. Bowman.
 4           I wasn't sure.  I have never had a hearing like
 5   this before.  I thought you just might question him
 6   yourself.
 7           THE COURT:  Well, the burden is on him to prove
 8   his entitlement to withdraw the Motion.  I guess I will
 9   leave it to you and Mr. Dishner how you proceed with that.
10           MR. FABUS:  He will take the stand, Your Honor.
11           THE COURT:  All right, Mr. Dishner, come around
12   and be sworn.
13           THE COURTROOM DEPUTY:  If you will please raise
14   your right hand.  Do you solemnly swear that you will true
15   answer make to all questions asked you at this present
16   inquiry as shall you answer under God?  If so, please I do.
17           THE WITNESS:  I do.
18           THE COURTROOM DEPUTY:  Please be seated.
19           THE COURT:  All right, Mr. Fabus, you may go
20   forward.
21              JONATHAN ANDY LOGAN DISHNER,
22          the first witness, having been duly sworn,
23            was called on behalf of the Defendant,
24          was examined and testified as follows:
25                   DIRECT EXAMINATION
```

BY MR. FABUS:

Q     Would you state your name for the Judge.

A     John Dishner.

Q     Mr. Dishner, you understand why we are here today; correct?

A     Yes, sir.

Q     You are asking the Court to allow you to set your guilty plea aside and let you proceed to trial?

A     Yes, sir.

Q     Can you explain to the Court why you want the Court to set your guilty plea aside?

A     On November the 17th we had a hearing.  I had a different lawyer, David Leonard.  At the time -- about a week before the hearing, I asked him -- well, about a couple of months before, I asked to go to trial and every time I asked him to go to trial, he kind of like veered off from it.

      So on the 17th, we come to Court, and he explained to the Judge that he was wanting to come off my case, due to me wanting to go to trial.

Q     Let me backtrack a bit.  Prior to that, your change of Plea Hearing was November the 17th, and at that point in time, there was a Motion filed where you were asking for a new attorney at that point in time.  Had there been a Motion filed once before where you were asking for a new attorney?

1  A   I believe so.  But this Motion here Mr. Leonard filed
2  himself because I wanted to go to trial.
3  Q   Okay.  Let me make sure I've got my dates right.  Do
4  you remember going to Court on September the 6th of 2017?  I
5  think you wouldn't have been in front of this Judge, you
6  would have been in front of Judge Corker.
7  A   I believe so.
8  Q   You had filed asking for a new attorney and then you
9  got in front of the Judge and you withdrew it?
10  A   Yes, sir.  Mr. Corker said that I had a good lawyer,
11  that me and him needed to get along.  So I agreed and I just
12  dismissed the Motion.
13  Q   Okay.  You voluntarily withdrew it; right?
14  A   Yes, sir.
15  Q   Okay.  Sometime thereafter was when you signed the plea
16  agreement; right?  Do you remember about how long it was
17  after that hearing you signed the plea agreement?
18  A   It might have been a couple months, I think.
19  Q   If the Court records reflect about six weeks; does that
20  sound about right?
21  A   Yeah.  Yeah.  That sounds about right.  I talked to
22  Mr. Leonard and explained to him that I was really wanting
23  to go to trial and I didn't want to take the plea bargain.
24  About a week before the hearing, he came and spoke to me
25  and he explained that he wasn't going to trial with me,

1  that he filed a Motion to come off my case.

2  Q    Okay.  But at some point you did sign the plea

3  agreement and it got filed; right?

4  A    Yes.  Yes, sir.

5  Q    So when Mr. Leonard came and told you he was filing a

6  Motion to Withdraw from your case, that was after you had

7  already signed the plea agreement?

8  A    Yes.  After I signed the plea agreement, I had my

9  family call him, and had him come back to the jail so I

10  could speak with him.  And that is when me and him got in a

11  disagreement, because he felt that I should take the plea

12  bargain.  I didn't want to take the plea bargain.  So he

13  filed a Motion to come off my case on the 17th of November.

14  Q    You showed up here November the 17th and I got you

15  the transcript from that hearing; right?

16  A    Yes, sir.

17  Q    You were in front of this Judge that you are sitting

18  right beside; right?

19  A    Yes, sir.

20  Q    Now, in that transcript Mr. Greer -- Judge Greer -- I'm

21  sorry -- asked you multiple times -- he told you multiple

22  times that you did not have to take the plea.  That you

23  could get out of it and you could still go to trial.  He

24  asked you that multiple times that day; right?

25  A    Yes, sir.

1  Q    Okay.  So why didn't you tell him yes, that you wanted
2  to go to trial?

3  A    I was -- I think I was more confused and -- where my
4  lawyer was trying to come off my case.  We'd already had the
5  argument.  Mr. Greer said he wasn't going to take him off my
6  case and that I would have to go to trial with him.

7  Q    Do you remember when the trial was set for?

8  A    November -- December the 5th.

9  Q    So it was less than three weeks away from your change
10 of Plea Hearing?

11 A    Yes, sir.

12 Q    Do you remember that day ever telling the Judge you
13 were just ready to get it over with?

14 A    I believe I did.  I was upset because of some of the
15 things Mr. Leonard had said.

16 Q    Doesn't the transcript actually reflect that you said
17 that on two different occasions?  "I am just ready to get it
18 over with."

19 A    Yes, sir.

20 Q    Okay.  But even when you said that, the Judge
21 stopped -- interrupted you and wanted to make sure that you
22 knew what you were doing and that it was voluntary; right?

23 A    He did.

24 Q    Are you here today maintaining your innocence?

25 A    No.  I am not maintaining my innocence.  I am just

1  wanting to have my right to a trial and maintain my right

2  for a trial.

3  Q    Okay.  So after the November 17th hearing, when did

4  you first tell Mr. Leonard that you wanted to go to trial

5  again?

6  A    I think I might have been in Salem for 33 days, maybe

7  35 days, I started thinking back on what was said at the

8  hearing, and I called him and told him that I felt like we

9  should try to part ways and I should get another lawyer, and

10  that I wanted to pull my plea back.

11  Q    Okay.  So it was about a month after the hearing?

12  A    I believe so, sir.

13  Q    Okay.  And then did you file a Motion or did

14  Mr. Leonard file the Motion?

15  A    I filed the Motion, sir.  I sent him a letter to file

16  the Motion, I think.

17  Q    Okay.

18  A    I think I did, yeah.

19  Q    Were you concerned about going to trial with your

20  attorney when your hearing was only about three weeks -- the

21  trial was only about three weeks away?

22  A    Yeah, I was concerned about that.  But my real -- my

23  main concern was what was said at my hearing.

24  Q    What specifically did he say that sits with you like

25  that -- that bugs you?

1  A    I believe in -- around about -- that me and him

2  couldn't get along.  And that he felt like we was going to

3  put hands on each other or fist fight -- something like

4  around that demeanor.  And some where on into the hearing he

5  explained to Mr. Greer that if -- well, Mr. Greer told him

6  that he wouldn't take him off my case and we just needed to

7  get along.

8       So that is when he asked me if I was going to take a

9  plea and I said yes.  And Mr. Leonard said that he didn't

10  have a problem representing me other than -- it seemed like

11  he said I was going to lie if I went to trial and got on the

12  stand.  I am not for sure that is what was said, but --

13       MR. FABUS:  Judge, if I can interrupt for a

14  second.  It just dawned on me.

15       Have you never even had a chance -- you haven't

16  been able to -- they haven't been able to see -- I am

17  referencing stuff that happened in that sealed portion of

18  that hearing.

19       Out of fairness to the Government, shouldn't they

20  be able to see that transcript?

21       THE COURT:  They should.  I was not aware that

22  they couldn't.  When was that --

23       MR. BOWMAN:  I noted that in my response, Judge.

24  That portion of the transcript was --

25       THE COURT:  Oh, that was the ex parte portion --

1    MR. BOWMAN:  Yes, sir.

2    THE COURT:  -- of the hearing, that is what you

3  are talking about?

4    MR. BOWMAN:  That was never released to the United

5  States.

6    MR. FABUS:  With us referencing it -- I guess I

7  wanted to bring that to your attention however you rule on

8  that.  Because that was one of the most concerning things I

9  was raising was Mr. Leonard actually represented to the

10 Court, "If I continue representing him, we may end up in a

11 fist fight."

12    THE COURT:  Well, my concern about those kinds of

13 hearings is that it will disclose things to the Government

14 that should not be disclosed.

15    If you and Mr. Dishner have no objection to that

16 transcript being available the Government, I will certainly

17 permit the Government to see it.  Otherwise, I will need to

18 review it, I suppose.

19    MR. FABUS:  Okay.  I guess I probably will need to

20 double check it.  I did just want to raise that issue.

21    THE COURT:  One of the things I would be concerned

22 about, of course even at this point, is that if Mr. Dishner

23 is successful in withdrawing his guilty plea and goes to

24 trial, I would not want any confidences to be disclosed to

25 the Government or any trial strategy to be disclosed to the

1  Government.

2       MR. FABUS:  Okay.  I understand.  I was just

3  trying to be fair.  I hadn't thought that through all the

4  way.

5  BY MR. FABUS:

6  Q    Since I've been on your case have you wavered at all

7  about whether you wanted to go to trial or set this aside --

8  or take the plea, I mean?

9  A    No.  I haven't wavered.  That's why --

10 Q    That's actually why things were probably contentious

11 with us early on?

12 A    Yeah.  I think that's why me and you was kind of -- we

13 had a little bit of a -- I felt like you was trying to get

14 me to take it too, but I see now that we was just -- I was

15 looking at it in a different light.

16 Q    Okay.  But you've maintained that you wanted to go to

17 trial all these last couple of months?

18 A    Yeah, this whole time I have maintained that I would

19 like to go to trial.

20       MR. FABUS:  Okay. I will pass the witness, Judge.

21       THE COURT:  All right.  Mr. Bowman, cross examine?

22                 CROSS EXAMINATION

23 BY MR. BOWMAN:

24 Q    Mr. Dishner, you were asked about a Motion that you

25 filed requesting -- back in September of 2017 -- that

```
 1   Mr. Leonard be relieved from representing you and that you
 2   receive a new lawyer?
 3   A    Yes, sir.
 4   Q    Okay.  And in fact, one of the things that you
 5   mentioned at that time that concerned you about
 6   Mr. Leonard's representation of you was that a lack of
 7   Motions having been filed; do you recall that?
 8   A    I believe I do recall.
 9   Q    Okay.
10   A    Maybe it was something about an Evidentiary Hearing.
11   Q    And in fact, I believe the Magistrate Judge even
12   indicated to you at the time that Mr. Leonard was one of
13   only a couple of attorneys out of 20 some Defendants in your
14   case that had filed a number of Motions?
15   A    Yes, sir.  I believe he said that.
16   Q    In fact, you know that to be the case, that Mr. Leonard
17   filed a number of Motions on your behalf?
18   A    I believe he filed a Motion of Discovery.
19   Q    Okay.  He filed some other Motions as well.  You are
20   not aware of that?
21   A    No.
22   Q    Okay.
23   A    Aware of what?
24   Q    That David Leonard filed a number of Motions on your
25   behalf in this Court.
```

1    A    The Motions I remember that he has filed is either been

2    to come off my case or the Motions that I filed.  I believe

3    he filed a Motion for a private investigator that talked to

4    me one time.

5    Q    Well, he filed a Motion to Compel Disclosure of the

6    existence and substance of promises of immunity, leniency,

7    or preferred treatment; are you aware of that?

8    A    No, sir.  I never got no Motion saying nothing like

9    that.  If he filed any Motions that I don't have, it's

10   because it was never sent to me.

11   Q    He filed a Motion for the United States to disclose the

12   identity of all participating informants in your case; are

13   you aware of that?

14   A    No.

15   Q    He filed a Motion for Disclosure of 404(b) Evidence;

16   are you aware of that?

17   A    No, sir.  I've never heard of it.

18   Q    A Motion for Early Jencks Material, in other words,

19   witness statements against you; are you aware he filed that?

20   A    Is that the Motion of Discovery?

21   Q    It is a Motion for Early Jencks Material, statements by

22   witnesses against you.  You are not familiar with that?

23   A    In the Motion of Discovery -- I had statements in the

24   Motion of Discovery.  That is the only Motion -- I mean,

25   statements that I have seen.

1  Q    Okay.

2  A    Or any other Motions that I have seen so far.

3  Q    Now, when the case was filed, being the indictment

4  returned by the Grand Jury in this case, it charged you with

5  three separate offenses.

6       It charged you with participation in the conspiracy,

7  that you ultimately pled guilty to.  It charged you with a

8  substantive count of possession of methamphetamine, and also

9  possession of a firearm in furtherance of drug trafficking.

10 You are familiar with that; correct?

11 A    Yes, sir.

12 Q    And Mr. Leonard explained to you that on the drug

13 trafficking or conspiracy count, you faced a minimum

14 mandatory of ten-years up to life imprisonment.

15 A    He did.

16 Q    Okay.  And in fact, the Magistrate Judge had already

17 explained that to you as well when you initially appeared

18 before this Court; correct?

19 A    The Magistrate Judge?

20 Q    Downstairs.

21 A    Yeah, whenever we got arraigned.

22 Q    He also explained to you that on top of that, you would

23 face at least another five years of imprisonment for the

24 firearm charge if you were convicted of that; correct?

25 A    Yes, sir.

```
1   Q    Okay.  And, of course, Mr. Leonard explained to you
2   that by entering into a guilty plea you would avoid that
3   five-year consecutive conviction for the firearms charge?
4   A    Yes, sir, he did.  But after I looked at the plea
5   itself, I was enhanced two enhancements, factor four, and I
6   would have been better off if I had took the gun charge.
7   Q    Okay.  What were those enhancement factors that you
8   noticed?
9   A    It was a two point -- a two-level enhancement.
10  Q    For what?
11  A    The gun.
12  Q    Are you talking about actually looking at the
13  Presentence Report or looking at the plea agreement?
14  A    It was in the Presentence Report.
15  Q    Okay.  And you are saying that that two-level increase
16  is more than the additional 60 months that you would receive
17  had you been convicted of the gun charge at trial?
18  A    I believe.  I believe it's somewheres around the same
19  thing if I was -- if the gun would have been dismissed
20  completely, I am still being kind of charged with it.
21          THE COURT:  Mr. Dishner, where did you get that
22  idea?
23          THE WITNESS:  Of what?
24          THE COURT:  That you would have been better off
25  without the gun enhancement and conviction on the gun
```

1  charge?

2        THE WITNESS:  Whenever I was adding up the time, I

3  thought that whenever I added up the time, it seemed like it

4  was more on the two point level -- the two level -- because

5  of the two level, it made it 188 to 235.  If it wouldn't

6  have been for the two level enhancement, I think it would

7  have been 150 to 180.

8        THE COURT:  Okay.

9  BY MR. BOWMAN:

10 Q   So you are talking about a difference of 30 some months

11 between the enhancement and not having the enhancement;

12 correct?

13 A    If I added it up right, I thought it was right at the

14 five-year mark.

15 Q    Okay.  And you understood from your conversation with

16 Mr. Leonard that the guideline range was advisory.  In other

17 words, the Court is not bound by that guideline range.

18 A    I didn't understand that until Mr. Greer told me at the

19 hearing that we had on November the 17th.  He explained to

20 me about the guideline range.

21 Q    Okay.  And of course the Court explained to you, and I

22 am sure that both the Magistrate Judge and Mr. Leonard

23 explained to you that the Court has no discretion however to

24 depart below a minimum mandatory sentence.

25        So while the two levels that you have just talked about

1  with regards to the enhancement to your guideline range, the

2  Judge has the discretion to depart away from that.

3       If you'd been convicted of the gun charge, the Judge

4  had no discretion but to sentence you to a five-year

5  consecutive sentence.  That was explained to you; wasn't it?

6  A    I believe so, sir.

7  Q    Okay.  And one of the things that you would have

8  discussed with Mr. Leonard was the proposed plea agreement

9  that the United States had sent to Mr. Leonard.  You went

10 over that plea agreement; didn't you?

11 A    Mr. Leonard come to me maybe about a week and a half

12 before my Court hearing.  We sat down maybe 20 to 25

13 minutes.  He explained, I think, the rough scenario of the

14 plea agreement.

15      He didn't even give me time to take it back to the pod

16 to sign it.  He said that if I wanted it, I had to sign it

17 before he left.  That's how it went that day.

18 Q    Well, let's talk about that then.  You signed your plea

19 agreement.  If you will look there on the screen.

20      (Document displayed on the computer screen.)

21 BY MR. BOWMAN:

22 Q    Do you recognize that as your plea agreement?

23 A    Yes.

24 Q    In fact, that is your initials down at the bottom?

25 A    Yes, sir.

```
1   Q    Okay.  And on the last page, that is your signature;
2   correct?
3   A    Yes, sir, it is.
4   Q    Okay.  You signed that on October the 19th of 2017?
5   A    Yes, sir.
6   Q    Okay.  And you also -- well, following that, it was
7   November the 7th of 2017 that you entered your plea;
8   correct?
9   A    November the 17th.
10  Q    You are right.  On November the 17th, excuse me.
11  A    Yes, sir.
12  Q    So it was a month that had passed between talking to
13  Mr. Leonard about your plea agreement and when you actually
14  came before this Court and entered the plea?
15  A    Well, we talked again, like -- it's on record that we
16  talked again, like maybe -- oh, I don't know what date it
17  was.  The 17th of November -- it might have been a Friday.
18  He explained to the Judge that -- it was like the Friday
19  before that or that Thursday -- that he came and talked to
20  me, and that I asked him not to turn it in.  That I was
21  really wanting to go to trial instead of taking a plea.
22  Q    Okay.  Now, the United States sent Mr. Leonard a plea
23  agreement before this one, back in August of 2017.  And
24  Mr. Leonard came and met with you about that plea agreement
25  as well; didn't he?
```

```
1   A    I believe so, sir.  Yes, sir.

2   Q    Okay.  And Mr. Leonard requested that some changes be

3   made to that plea agreement?

4   A    He did?

5   Q    The earlier plea agreement, Mr. Leonard asked me, on

6   behalf of the United States, to make some changes to that

7   plea agreement; isn't that correct?

8   A    Yes, sir, he did.

9   Q    Okay.  And, in fact, the plea agreement that you signed

10  on October the 19th of 2017, reflected those changes that he

11  had requested be made?

12  A    Yes.

13  Q    Okay.  And then, in fact, when you and Mr. Leonard went

14  through the plea agreement some additional language was

15  added; correct?

16  A    From what I can see, yes, sir.

17  Q    Okay.  And you initialed that?

18  A    I did.

19  Q    Okay.  So when you signed that plea agreement on

20  October the 19th of 2017, that plea agreement reflected

21  changes that you had requested to the earlier plea

22  agreement, and also a hand-written change made by you and

23  Mr. Leonard?

24  A    That was the plea agreement he had brought to me.  It's

25  the second one.
```

1  Q    Okay.  That handwriting was not on that though until

2  after you and Mr. Leonard discussed it; correct?

3  A    As far as I know.  I thought that it was.  I am not

4  sure.  When I signed it, it was on there, I think.

5  Q    Okay.  But Mr. Leonard went through all of this

6  information with you; correct?

7  A    Most of it.

8  Q    Okay.  And after you signed this, you then requested

9  Mr. Leonard to go to trial.  That you didn't want to go

10 through with the plea agreement; is that correct?

11 A    That -- I'm guessing it was like two weeks afterwards,

12 I asked him to come and talk to me and I told him I really

13 wasn't wanting him to turn the plea agreement in.  That I

14 would like to go to trial.

15 Q    So at that point in time, I think you indicated on

16 direct examination that Mr. Leonard filed a Motion to

17 Withdraw from your case?

18 A    Yes, sir, he did.

19 Q    Okay.  And you indicated that the reason that

20 Mr. Leonard sought to withdraw is because you wanted to go

21 to trial?

22 A    Yes, sir.

23 Q    But, isn't it --

24 A    It was one of them.  He filed for a client privilege --

25 I can't remember if it was client privilege confidentiality

1  or client -- I can't remember which one -- what it was --

2  what kind of Motion he filed to come off my case.  But, yes,

3  he filed a Motion to come off my case because I wanted to go

4  to trial.

5  Q    Okay.  But isn't it true that Mr. Leonard had indicated

6  to you that if you wanted to go to trial, he was willing to

7  try the case?

8  A    Mr. Leonard, during the conversation we had on November

9  the 17th at the hearing, after Mr. Greer told him that he

10 wasn't coming off my case, that we was just going to have to

11 get along.  He said, "Your Honor, I have no problem."  I

12 don't know if you have seen the paperwork or not --

13 Q    I have not.

14 A    He said, "Your Honor, I have no problem representing

15 him, as long as he doesn't want to take the stand at his

16 trial.  That's where we get into problems.  I don't want to

17 get into that, Your Honor."  Such and such, and such and

18 such, somewheres around like that.  So, yeah, that was right

19 after that.

20 Q    But isn't it true that what Mr. Leonard had told you

21 was that it was your decision, ultimately, whether or not to

22 testify?

23 A    Yes, sir.

24 Q    Okay.

25 A    I still don't know what he was talking about me lying.

1  That's what I -- that's another thing.  I was never going to

2  get on the stand and lie about nothing.

3  Q    Well, isn't it true that Mr. Leonard advised you that

4  it was against your best interest to take the witness stand?

5  A    Mr. Leonard never really -- when we talked about it he

6  didn't really even talk to me about taking the witness

7  stand.  He was more or less wanting me to take the plea.  He

8  said he didn't want to see me get a life sentence.

9  Q    Okay.  So in other words, Mr. Leonard was attempting to

10 negotiate a plea that he felt like was in your best

11 interest?

12 A    That he felt like was in mine and his interest.

13 Q    Okay.  Well, what was his interest?

14 A    Well, I feel like that he really didn't want to take

15 the case on.  That is how I felt.  I really don't know

16 really what his interest was, sir.

17       I tried to talk to him and tried to talk to him, and

18 the more we talked, the more that it come -- like we

19 couldn't get along about the situation.  That's one

20 reason -- one thing he talked about in the Motion was that

21 me and him couldn't get along that -- the client privilege

22 thing had been too far gone.

23       That was the big issue.  Because I wanted to go to

24 trial and he didn't feel like I should or he didn't want me

25 to, one of the two.

1  Q    Well, I know you indicated that the Magistrate Judge

2  told you that you had a really good lawyer?

3  A    Yes, sir.

4  Q    In fact, you had learned that Mr. Leonard had tried a

5  number of cases in this Court?

6  A    Yes, sir.

7  Q    Okay.  And that even so, it was your feeling that he

8  didn't want to take your case to trial?

9  A    After what he said in the Motion in my hearing, I

10 really did feel like it was best that we parted ways.  And

11 my feeling is, I really feel like he didn't want me to go to

12 trial.

13 Q    Now, on November the 17th of 2017, during that

14 hearing, where only you and Mr. Leonard were present before

15 the Judge, at that point, Judge Greer gave you the

16 opportunity --

17 A    Yes, sir.

18 Q    -- to tell him that you didn't feel like Mr. Leonard

19 was looking out for your best interests.  You had that

20 opportunity; correct?

21 A    Yes, sir.

22 Q    Okay.  Did you tell the Judge that?

23 A    No, sir.  I didn't.  I told the Judge that I would just

24 take the plea bargain, that I would go ahead and get it over

25 with.  The plea bargain was already signed.  I was -- once

1  Mr. Leonard started talking about the Motion that he filed

2  and about my case, I really got scared and upset.

3       So I just, more like I said in the Motion, I would just

4  go ahead and get it over with.  But after I reflected on it

5  for a couple weeks, I really see that how it -- I really

6  feel like that -- not that my rights had been violated but,

7  maybe I wasn't treated fairly by Mr. Leonard at the time.

8       You know, it had nothing to do with the Court, it's

9  just when Mr. Leonard started talking about -- I don't even

10 know where he thought that that we was going to fist fight or

11 anything like that -- it really upset me, and it scared me.

12 So I just wanted to get it over with.

13 Q    Well, what had Mr. Leonard done that was unfair to you?

14 A    Mr. Leonard, as far as I know, me and him just couldn't

15 get along because I wanted to go to trial.  He didn't do

16 nothing unfair to me, as far as I know.

17 Q    We have established that he filed Motions on your

18 behalf.  He discussed every plea offer that was made by the

19 United States with you.  That is true; isn't it?

20 A    Yes.

21 Q    He managed to get the United States to modify the first

22 plea agreement; correct?

23 A    Yes, sir.

24 Q    He made additional hand-written changes to the second

25 plea agreement that the United States accepted; isn't that

1  true?

2  A    From what you showed me, yes, sir, it looks like that's

3  true.

4  Q    Have you read the change of plea colloquy in this case?

5  A    Mr. Leonard had read it to me, somewhat, mostly about

6  my rights.

7         THE COURT:  What he is asking about, Mr Dishner,

8  is the transcript.

9         THE WITNESS:  Oh, the transcript, yes.  I --

10 BY MR. BOWMAN:

11 Q    Did you go over that with Mr. Fabus?

12 A    Yes, sir.

13 Q    Okay.  And so you know that the Judge went over this

14 factual basis with you at that hearing?

15 A    Yes, sir.

16 Q    And talked about the changes that were made in the

17 factual basis and that you agreed to those; correct?

18 A    Yes, sir.

19 Q    Now, the second part from the discussion you had with

20 Judge Greer about whether Mr. Leonard would continue in your

21 representation, I then came back into the Courtroom and the

22 Court went ahead with the change of plea.  You recall that

23 as being the series of events; don't you?

24 A    Yes, sir.

25 Q    And the Judge indicated to you what you were charged

1  with at that hearing, and that you had entered into, of

2  course, this written plea agreement; correct?

3  A    Yes, sir.

4  Q    And as we have established, I have not been privy to

5  that hearing about Mr. Leonard's representation.  But Judge

6  Greer indicated during that hearing that he understood,

7  pursuant to that plea agreement, and pursuant to your

8  representations to the Judge that morning, that you wished

9  to change your plea to a plea of guilty to count one of the

10 indictment.  And you said, "Yes, sir."

11 A    Yes.

12 Q    And the Judge asked you if you understood that you were

13 under oath at that point, and you understood that; correct?

14 A    Yes, sir.

15 Q    And you understand that you are under oath here today?

16 A    Yes, sir.

17 Q    And you understand that if you testify falsely, you can

18 be prosecuted for testifying falsely before this Court?

19 A    Yes, sir.

20 Q    You indicated that you had some difficulty in reading

21 and writing to the Court; isn't that true?

22 A    Yes, sir.

23 Q    But you indicated that Mr. Leonard had explained to you

24 anything that you had difficulty in reading in this case;

25 correct?

A    Mr. Leonard, what I couldn't read, he read to me, for
the most part.

Q    He explained to you any questions you had about the
plea agreement, or of the indictment, or any other documents
in this case; correct?

A    Yeah, for the most part.

Q    Well, is there something you asked him that he didn't
explain to you?

A    Through the plea agreement, I think he -- there was
another thing about the gun charge that was supposed to have
been dismissed.  I thought that I would be able to get in a
treatment program while I was in the feds and there to the
point of enhancement, it knocked me out of that.

     That was another reason that I think that me and him
was at odds about the plea agreement.

     At first he told me that I could -- I understood
that -- when me and him spoke the other -- that it was going
to be 120 months.  I would be able to get a drug treatment
program.  In six to seven years I would be home.

     Once the plea agreement was brought to the Court, and
we talked again, he explained to me that it would be more
than 120.

Q    Well, now, the Magistrate Judge had explained to you
the minimum sentence you could get on count one was ten
years.

```
1   A    Uh-huh.

2   Q    That was the bare bottom.  Okay.  Mr. Leonard had

3   explained to you that the minimum you could get on count one

4   was ten years; correct?

5   A    I'm sure he said the minimum would be ten years.

6   Q    Okay.  And then if you were then also convicted of the

7   gun count, that was another five years at least?

8   A    Yes, sir.

9   Q    And that the Court could sentence you up to life?

10  A    On November the 17th, Mr. Greer told me it could be up

11  to life.  Yes, sir.

12  Q    Okay.  Well, the Magistrate Judge told you that as

13  well; correct?

14  A    If he did, I don't recall it.

15  Q    Mr. Leonard told you that; didn't he?

16  A    Well, Mr. Leonard didn't say I would get life.  He just

17  said that if I went to trial that I would probably get life.

18  Q    Okay.  And he told you that was based upon his

19  calculation of your criminal history?

20  A    My criminal history is DUI -- and theft over a

21  thousand.

22  Q    Well, that is not the only prior convictions you had?

23  A    Yeah.  Misdemeanor assault, that is what the points

24  are, the points.

25  Q    Have you reviewed your Presentence Report in this case?
```

1  A    I have, mostly it is all juvenile, and underage

2  consumption, DUI, theft over a thousand.  You can look at it

3  there if you'd like to real quick.  I don't mind.

4  Q    Your criminal history score was 21.

5  A    Yes, sir.  I believe that's wrong.

6  Q    So are you saying that some of these prior convictions

7  are not you?

8  A    No, sir.  I never said that.  I said that some of them,

9  like I thought some of the points might have been a little

10 higher than what they were supposed to have been.

11 Q    Okay.  But all these prior convictions then are you?

12 A    If they are on there.

13 Q    Now, you indicated Judge Greer explained to you what

14 the potential penalties were that you faced, and you

15 indicated that you understood that?

16 A    Yes, sir.

17 Q    Okay.  And he explained to you that you could face up

18 to life in prisonment?

19 A    Yes, sir, at my hearing, he did.

20 Q    And the Judge also asked you about whether your

21 attorney had done any estimates for you of what your

22 guideline range might be; do you remember that?

23 A    Yes, sir.

24 Q    Okay.  And you agreed that all you had received was

25 just an estimate?

1  A    Yes, sir.  He sent me a guideline range through the
2  mail.
3  Q    Okay.  And that was explained to you that that was only
4  an estimate.  That, in other words, it was up to the Judge
5  to impose sentence; correct?
6  A    Well, after I started looking at everything, it was the
7  Presentence Report was what I think was what showed me what
8  my time was going to be.  I guess from the 188 to 235, the
9  Judge could go out beyond those guidelines, I guess.
10 Q    But that was calculated after you entered your guilty
11 plea?
12 A    Yes, that is in my Presentence Report.
13 Q    But prior to entering your guilty plea, Mr. Leonard had
14 estimated what he thought your guideline range would be;
15 correct?
16 A    Yeah.  To the closest that he could.
17 Q    And the reason it was to the closest that he could is
18 it is just an estimate.
19 A    Yes, sir.
20 Q    And you understood that?
21 A    Yes, sir.
22 Q    In fact, the Judge indicated to you that until that
23 Presentence Report was completed, the Judge wouldn't even
24 know what that estimate was; true?
25 A    Yes, sir.

1  Q    At that Change of Plea Hearing, the Court asked you if

2  you understood all the terms and conditions of that plea

3  agreement you signed, and you indicated that you did

4  understand those; correct?

5  A    I did.

6  Q    You agree that you placed your initials on each page

7  because you had reviewed every page of that plea agreement;

8  correct?

9  A    Yes, sir.

10 Q    And the Judge explained to you that if you chose not to

11 plead guilty that you could then go to trial?

12 A    He did.  Yes, sir.

13 Q    In fact, the Judge indicated there was a jury trial

14 scheduled on December the 5th and that you could have your

15 trial on that date if you wanted to go forward?

16 A    Yes, sir, he did.

17 Q    Okay.  And the Judge explained to you that you had the

18 right to testify, and the right to call witnesses at that

19 trial if you wanted to?

20 A    Yes, sir.

21 Q    And the Judge asked you if you understood that if your

22 plea was accepted on that November the 17th of 2017, that

23 there would be no trial, and you said you understood that?

24 A    He did.

25 Q    Now, Judge Greer asked you after that if you understood

1  and indicated that you had talked about it during the closed

2  hearing, but did you understand that it was unlikely that

3  the Court would later let you withdraw your guilty plea?

4  A    Yes, sir.  I believe I remember the Judge saying

5  something to that.

6  Q    And you said, "Yes, sir.  I understand."  Is that true?

7  A    If it is on there, I said it.

8  Q    Okay.  You indicated that nobody had put any pressure

9  on you mentally or physically to induce you to plea.  Isn't

10 that true?

11 A    Yeah.  I guess so.

12 Q    You indicated that no threats or promises had been made

13 to induce you to plead guilty.  That's true, isn't it?

14 A    That's true.

15 Q    The Court asked you if you had reviewed the stipulation

16 of facts in the plea agreement, and you indicated that you

17 had.  That's true; isn't it?

18 A    Mr. Leonard went over them with me.  I believe most of

19 them he went over with me.

20 Q    And, in fact, the Court indicated that it was a rather

21 lengthy stipulation of facts.  Isn't that true?

22 A    If it is there, it is what it says, sir.  Yes, sir.

23 Q    And the Judge asked you if all those facts set forth in

24 paragraph four of the plea agreement were true, and you

25 said, "Yes, sir."  Isn't that true?

1   A    Yes, sir.

2   Q    Now, but the Judge went beyond that.  The Judge, Judge

3   Greer, asked you, "All right, and if there is any hesitation

4   about your answer to that question, Mr. Dishner, as I have

5   described, as I have told you several times, now is the time

6   to express it."  Do you remember him asking you that?

7   A    Yes, sir.

8   Q    But you still didn't indicate to Judge Greer that you

9   wanted to go ahead with the trial.

10  A    Sir, I was -- when Mr. Greer said that I would have to

11  get along with my attorney, and I had until December the

12  5th and we would go to trial, I felt like I had really no

13  choice but to take the plea at the time.

14       You know, that's really how I felt.  Because the way me

15  and Mr. Leonard was having, you know, the heated arguments,

16  and he had already filed a Motion to come off my case.

17  Mr. Greer was going to leave him on my case.

18  Q    But you have already told us that you didn't tell Judge

19  Greer that Mr. Leonard didn't want to try your case.

20  A    Mr. Leonard stated it in his Motion.

21  Q    Mr. Leonard said in his Motion, what?

22  A    Mr. Leonard -- I'm pretty sure what it said in the

23  Motion was that, "Mr. Dishner wants to go to trial now.  He

24  don't want to take a plea bargain.  Due to that, there is

25  conflict of interest."

1      Maybe that is what it says -- or maybe client-attorney

2  -- client-attorney privilege -- something broke, that he

3  filed.  It was something in the Motion that he filed to come

4  off my case that day of the 17th.

5            MR. BOWMAN:  Well, Judge, I am sure that will

6  speak for itself.  But, of course, I don't have access to

7  Mr. Leonard's Motion other than indicating that he was

8  filing a Motion to Withdraw.

9  BY MR. BOWMAN:

10 Q    It had just been in September, approximately two months

11 before that, that you had asked Judge Corker for a new

12 lawyer.  Did you tell Judge Corker that Mr. Leonard wouldn't

13 take your case to trial?

14 A    At the time we really didn't have that discussion at

15 the time.

16 Q    Well, what was your concern about Mr. Leonard at that

17 point in time?

18 A    Well, I think that we had already started arguing.

19 Heated arguments, I believe.  I am pretty sure that was what

20 it was about.

21 Q    So there was some heated arguments.  What were the

22 heated arguments about?

23 A    I guess me not seeing it -- his point of view and him

24 not seeing my point of view.  We just didn't see eye-to-eye,

25 sir.

1  Q    Yet, when Judge Corker brought you before his Court in

2  September, you told him that you had changed your mind, that

3  you wanted Mr. Leonard to remain on your case?

4  A    Yes, sir.  After we talked, I told Mr. Corker that we'd

5  get along and would be fine, told him that we would make it

6  work.

7  Q    How did you go from heated arguments to getting along?

8  A    Well, he talks about -- Mr. Leonard talks about it in

9  the Motion -- maybe not the Motion, but the transcript.

10      We both one minute would be -- both of us would be fine

11  and the next minute one of us would be yelling.  So to tell

12  you the truth, I still don't know to this day -- I can't

13  tell you what it was over.  It had to be over the case.  But

14  it wasn't nothing real, real serious other than me wanting

15  to go to trial.

16  Q    So your disagreement, as you put it, was not real

17  serious but for the fact that you wanted to go to trial and

18  Mr. Leonard didn't think you ought to go to trial?

19  A    Mr. Leonard, when I asked him a week before the hearing

20  that I wanted not to take the -- that I didn't want the plea

21  agreement brought to the Court and turned in.  That I wanted

22  to go on to trial.  That is, sir, when he filed the Motion.

23      Why he filed the Motion -- maybe you need to look at

24  the Motion that he said he filed, that way you can

25  understand it.  Because I'm going around -- I feel like I am

going around in circles with you.  That was the whole issue
between me and him.

Q    Okay.  Well, he did what you asked.  He filed a Motion
to Withdraw.

A    This was his doing.  I didn't ask him to file the
Motion.  He did it.  He filed the Motion himself this time
to come off my case because I wanted to go to trial.

Q    Okay.  Let's step back for a minute to this September
hearing before Judge Corker.  Judge Corker had actually
brought in another attorney to appoint at that time.  He
told you that; didn't he?

A    No, he never told me that I was getting another
attorney.

Q    But I mean he told you that he had prepared to appoint
another attorney if you and Mr. Leonard were not able to get
along.

A    I believe his words was that we needed to get along.

Q    So you are saying that Judge Corker forced you to keep
Mr. Leonard as your attorney?

A    He didn't force me.  I told him that we was all right.
That we would get along.

Q    Okay.

A    That's when he explained to me that Mr. Leonard was the
best of the best and I needed to listen to his advice.  So
that is what I tried to do till the last of it.

1  Q    Until after you entered your guilty plea?

2  A    After we signed the plea and then we talked shortly

3  after that, I told him that I wanted to go to trial, that's

4  when we had a big --

5  Q    That's when you had your what?

6  A    Huh?

7  Q    That's when you had your what?

8  A    A big argument.  A big -- like a big -- I guess that is

9  when he filed the Motion to come off my case.

10  Q    Okay.  So a few days before this hearing, you and

11  Mr. Leonard had a big argument.

12  A    About a week and a half.

13  Q    Okay.  And what was the subject then of that argument?

14  A    Well, it was just I felt like he hadn't showed me all

15  the evidence.  I felt like that he --

16  Q    Why you feel that way?

17  A    Because of what I'd been presented, what little I had

18  been presented and --

19  Q    Well, what had you been presented?

20  A    The Motion of Discovery with some statements.

21  Q    Okay.  But you said that you didn't feel like

22  Mr. Leonard had showed you all the discovery?

23  A    Not that he hadn't showed me all the discovery, that he

24  hadn't been -- that he hadn't tried his hardest on me

25  wanting to go to trial more or less.

```
1    Q    Are you saying that Mr. Leonard hadn't tried hard

2    enough to get additional evidence --

3    A    No --

4    Q    -- that the Government might have in its possession?

5    Is that what you are saying?

6    A    Not additional evidence of -- when me and him talked

7    about the Motions, he explained to me -- he did explain to

8    me what Motions that -- I barely remember some of them that

9    you said.

10         But he did explain to me some of them that he did --

11   that he filed, that I didn't have.  That he never give to

12   me, the paper part.

13         And I explained to him that I wanted an Evidentiary

14   Hearing at the time.  Which it might have been -- he might

15   have said that that wasn't something that he could do right

16   off hand.  And then we kind of got into an argument about me

17   wanting to go to trial.

18   Q    What did you tell him?

19   A    I told him that I felt like he was pushing me towards

20   more of the, you know, as I asked him that I wanted to go to

21   trial, that I felt like he more and more pushed me towards

22   the plea bargain.

23         Even though I know he done a great job with the plea

24   bargain that I still wanted to go to trial.  But he

25   wasn't -- he really wasn't happy with -- I guess that is
```

1   what he wasn't happy with, is that after he made up the plea

2   bargain, he didn't want to deal with the trial part.

3   Q    You testified, when Mr. Fabus was questioning you, that

4   you were not maintaining your innocence here today.

5   A    I said that -- yeah, I'm sorry -- I said that I am

6   not -- you know, I can't, you know, maintain my innocence

7   with what me and my lawyer talked about.  That I am not

8   saying that I am not guilty.  I am not saying I am guilty.

9   Q    Well, you did say you were guilty --

10  A    Okay.

11  Q    -- under oath before this Court; didn't you?

12  A    Yes, I did.  I am not saying that I am not.

13  Q    Just that you are wanting to go to trial?

14  A    Yes, sir.

15  Q    I think Judge Greer asked you, "And you are offering to

16  plead guilty because you are, in fact, guilty?"  To which

17  you said, "Yes."  Do you remember that?

18  A    Yes, sir.  I do.

19  Q    The Court explained to you -- Judge Greer explained to

20  you that the Court had the authority to impose a sentence

21  above your guideline range.  And that the Court could impose

22  a sentence of life in prison.

23       And you indicated that even so you still wanted to

24  plead guilty; isn't that true?

25  A    Yes, sir.  I believe I did.

Q    And then the Court, at the very end of your Plea

Hearing, asked you once again, "Is there any hesitation on

your part at all about whether you want to go forward with

this guilty plea at this point?"  Do you remember the Judge

asking you that?

A    I do.  Yes, sir.

Q    The Judge said, "If that is what you want to do, so if

you want a trial, I will give you a trial."  He told you

that; didn't he?

A    Yes, sir.

Q    But you still went ahead?

A    Like I said, sir, I really feel that after what was

said, I had no choice in the matter.  He didn't really want

to represent me to go to trial.  I already signed the plea

bargain, that's why I went ahead and went with it.

Q    The Court even went on to explain to you the benefit

that you had received in this plea agreement by virtue of

the quantity of methamphetamine, indicating the plea

agreement was less than what was contained in a statement

that you had given Agents.  That was explained to you;

wasn't it?

A    It was, sir.

Q    And the Judge still asked you once again, "And the real

question, Mr. Dishner, is whether or not you have knowingly

and voluntarily entered this guilty plea?"  And you said,

1    "Yes, sir."

2    A    Yes, sir.

3    Q    And Mr. Leonard indicated to the Court that one of the

4    concerns that you had voiced to him was the statement that

5    you had given to Agent Shannon Russell, Agent Jason Rourke,

6    and ATF Agent Jamie Jenkins back in July of 2016.  Is that

7    true?

8    A    Yes, sir.

9    Q    Okay.  And in that statement -- that was before you

10   were indicted in this case; correct?

11   A    That is what it says.

12   Q    Okay.  They read you your Miranda rights before they

13   talked to you; correct?

14   A    That is what it says.

15   Q    You signed a --

16                     EXAMINATION BY THE COURT

17   Q    Did they?  I mean, you keep saying, "That is what it

18   says."  Did they read you your Miranda rights?

19   A    They had me sign something, whatever that was.

20   Q    Did they read you your Miranda rights?

21   A    They give me a piece of paper to sign.

22   Q    Did they read you your Miranda rights?

23   A    Yes.

24   Q    And did you give them this statement before you were

25   indicted in this case?

1    A    Not the one that they signed saying that I said.

2    Q    I'm sorry?

3    A    Not the one that they're saying -- on the statement.  I

4    never said two kilograms of meth.  Never said nothing about

5    kilograms of meth.  Never said -- there's a lot in the

6    statement that's not accurate.  I said that in my last

7    hearing here.

8         Me and Mr. Leonard had a discussion about it.  But

9    that's for me to be proven.

10   Q    Mr. Dishner, let me ask you a simple question here.

11        If we have a trial on this and the Agents testify that

12   you gave them that statement, is there somebody other than

13   you who would testify that you didn't?

14   A    Just me and the Agents.

15   Q    All right.  Let's assume you testify that you didn't

16   give them that statement.  Who do you think that it is

17   likely that the jury will believe?

18   A    I mean if the jury --

19   Q    Let me ask you differently.  What do you think the odds

20   are that a jury will believe you, somebody who has had a

21   lengthy history since you were 15-years of age of criminal

22   convictions over those Agents?  What do you think the

23   likelihood of that is?

24   A    I believe that they are liable to find me guilty, but I

25   believe if all the evidence will show everything that

1  pertains to my case, I believe that it would come out that

2  it is aposterous. (sic)

3  Q    What is?

4  A    Sixteen kilos in 38 days.

5  Q    What evidence?

6  A    Whatever evidence they have.

7  Q    Well, you are risking a big chunk of your life on that

8  evidence. What evidence are you talking about?

9  A    The evidence I am stating, sir, is that I was in jail

10 from 2015 -- from September of 2014 all the way to May of

11 2016. They are saying that I give them a statement that I

12 sold two kilograms a week for each week for approximately

13 two months.

14      That is ridiculous. Anybody in their right mind knows

15 that is ridiculous. The DA knows that would be ridiculous.

16      I've never had a drug charge in my life. I'm an

17 addict, not a drug dealer. I was out for 38 days for doing

18 a driving charge. That is what I have always been caught up

19 in, driving. And that is mostly my history, underage

20 consumption or driving.

21 Q    Now, you made this statement on July the 13th of 2016.

22 When did you say you were in jail?

23 A    Went in September the 19th of 2014. I think I got

24 out around May the 8th -- May the 10th. I was at the

25 halfway house.

Q    Of 2016?

A    Yes, sir.

Q    So you were out two months or more before you gave this statement?

A    I was at the halfway house in Kingsport for two weeks and then I went home for my last three weeks before --

Q    And what proof would you use to show that is preposterous that you sold two kilos of crystal meth during those two months?  Two kilos a week.

A    I don't have that, sir.  I don't have a sale.  I don't have a buy.  I wasn't selling drugs like it says.  I never admitted to nothing like that.

     If I was going to admit to something so damaging, I think I would have some type of reason why I admitted to it.

Q    Whether you said that to the Agents or not, you told me under oath that it was true; didn't you?

A    What was true?

Q    That this statement that you sold approximately two kilograms of crystal methamphetamine per week for the last two months.  You told me that was true; didn't you?

A    When?

Q    Under oath.

A    When?

Q    On November the 17th.

A    Did I say it was true?

Q    You said everything in this factual basis was true;
didn't you?

A    If I agreed to it sir, I'd say, yes, sir, I'd agreed to
it.

Q    Now, the fact that I didn't ask you just one time, I
asked you several times if what you had stipulated to here
was true; didn't I?

A    You never said anything about a statement -- well, you
did.  You did.  And I said that I don't -- that was one of
the issues we had.  Mr. Leonard said the same thing was
about --

Q    No, sir.  I am sitting here looking at the transcript,
Mr. Dishner.  What you said is, "Yes, it is true."

A    I mean, if I said yes, I said, yes, sir.

Q    I asked you if you agreed with this summary of what you
did in the case, as it is set out in your plea bargain.  You
said, "Yes, sir."

     I asked you if everything in it was true.  "Yes."  I
asked you if you would stipulate under oath that everything
in it was true.  You said, "Yes."

A    Yes, sir.

Q    Now, why did you do that?

A    I didn't understand what was being asked of me.

Q    What didn't you understand about the question, "Is it
true?"

A     Well, I don't think you asked me about a statement.  I
think you said paragraph four.  I didn't -- I think I
stopped my lawyer two or three times, and was asking him
what was --

Q     I asked you if you had read paragraph four carefully.
Do you remember what you said?

A     I can't read -- I can't hardly read.  My lawyer read
most of everything to me.  But if I read --

Q     Mr. Dishner, I know that.  But you have written a
letter to the Court here that doesn't have a single
grammatical mistake in it as far as I can tell.

A     My bunkie helped me write -- I never wrote nothing.  It
was my bunkie that helped me do it.

Q     Well --

A     I don't write no letters.

Q     Either whether Mr. Leonard read it to you or whether
you read it yourself, you said, "Yes."  Right?

A     Yes, sir.

Q     And I asked you if you had reviewed it carefully with
your attorney.  You said, "Yes."  And I asked you if you
agreed with it, and you said, "Yes."  And so on; right?

A     Yes, sir.

Q     Why would you stand there and do that?

A     Like I was telling the DA, sir, that morning, once
things was said by Mr. Leonard, and it might not be much to

1    you all, but what was said by him, and he's my lawyer, I

2    really felt like he was against me.  So I just agreed to the

3    plea bargain.

4              THE COURT:  Go ahead, Mr. Bowman.

5              MR. BOWMAN:  Thank you, Your Honor.

6                   CROSS EXAMINATION (Continued)

7    BY MR. BOWMAN:

8    Q    Let's put this statement aside for a moment,

9    Mr. Dishner, and let's talk about your factual basis.

10        You have already agreed that Document 395 in this case

11   is your plea agreement which you signed; correct?

12   A    Yes.

13   Q    Paragraph four.  (As read)  "In support of the

14   Defendant's guilty plea, the Defendant agrees and stipulates

15   to the following facts, which satisfy the offense elements.

16   These are the facts submitted for purposes of the

17   Defendant's guilty plea.  They do not necessarily constitute

18   all of the facts in the case.  Other facts may be relevant

19   to sentencing.  Both the Defendant and the United States

20   retain the right to present additional facts to the Court to

21   ensure a fair and appropriate sentence in this case."

22        That is what it says; correct?

23   A    Yes.

24   Q    Is that a yes?

25   A    Yes, sir.

1  Q    This lady here is the Court Reporter.  She has to hear
2  your verbal --
3  A    Yes, sir.
4  Q     -- answer in order to take it down.
5  A    Yes, sir.
6  Q    Let's look at these paragraph by paragraph, and see
7  what you agree with now versus with what you agreed with on
8  November the 17th.
9       This indicates you were (as read) "a member of a drug
10 trafficking organization operating primarily in Sullivan
11 County, Tennessee and Southwest Virginia during the time
12 frame of the conspiracy charged in the superseding
13 indictment."
14      That is true; isn't it?
15 A    Southwest Virginia, is that Sullivan County?
16 Q    It says primarily in Sullivan County, Tennessee and
17 Southwest Virginia.
18 A    Oh.
19 Q    That is where the drug trafficking organization was
20 operating.  Is that true or not?
21 A     That is what I signed, sir.  I can't go -- I can't
22 dispute what I signed.
23 Q    (As read)  "Since approximately January 2015, the
24 organization obtained crystal methamphetamine, primarily
25 from Georgia, which was transported to Sullivan County,

1  Tennessee and Southwest Virginia, where it was distributed."

2      Is that true?

3  A    I don't know if it's true or not.

4  Q    Well, you told Judge Greer on November the 17th that it

5  was true.

6  A    I agreed to something -- I've already said I agreed to

7  it and Signed it.

8  Q    Okay.

9  A    I had already signed it.

10 Q    Well, on June 21 of 2016, you were arrested in Bristol,

11 Tennessee in possession of approximately three ounces of

12 crystal methamphetamine.  That's true; isn't it?

13 A    I was arrested.

14 Q    With approximately 3 ounces of crystal methamphetamine.

15 A    The three ounces of crystal methamphetamine was

16 not nowhere near me or on me.

17 Q    You told Judge Greer on November the 17th, that was

18 true; didn't you?

19 A    I did.

20 Q    Are you telling the Judge that wasn't your three ounces

21 of crystal meth today?

22 A    No, I am not.

23 Q    What are you saying?

24 A    I am saying that some of it I don't -- I still, you

25 know, I guess as you read it, I should have never signed it.

1    That is where we go back to my lawyer.

2    Q    It said you had a handgun with you, an Iver Johnson

3    .32 caliber revolver.  That is true; isn't it?

4    A    There was a gun in the car.

5    Q    Whose car was it?

6    A    It wasn't mine.

7    Q    Were you driving?

8    A    I was.

9    Q    Where did you get the car?

10   A    It was a borrowed car.

11   Q    From who?

12   A    Timothy Green.

13   Q    Timothy Green?

14   A    Yeah.

15   Q    How did you know Timothy Green?

16   A    I worked on cars for him.

17   Q    You met him through Stevie Hilliard; didn't you?

18   A    I didn't meet him through Stevie Hilliard.  I met

19   Stevie Hilliard through him.

20   Q    You told Agents that you got Timothy Green's name from

21   Stevie Hilliard who you were in jail with; isn't that true?

22   A    That's what they say.  That's what it said.  It's

23   wrong.

24   Q    But you are saying that it is the other way around?

25   A    It is the other way around.

1   Q   Okay.  So you are saying that you knew Tim Green, and

2   Tim Green had introduced you to Stevie Hilliard?

3   A   Uh-huh.

4   Q   Okay.  And you know both of them have been convicted in

5   this case?

6   A   Yes.  They was picked up with me and his cousin.

7   Q   Now, how long have you known Tim Green?

8   A   Not long.  I was at the halfway house needing work, he

9   allowed me to work on some vehicles for him for money.

10   Q   Okay.  Was one of those vehicles a white Mazda RX-8?

11   A   No.  It ain't a white Mazda RX-8.  It is, I think, a

12   couple of Hondas and a couple trucks.

13   Q   Okay.  When did he introduce you to Stevie Hilliard?

14   A   Sometime after I got out of the halfway house.

15   Sometime, I can't remember what month it was -- June.

16   Q   June of?

17   A   Of '16.

18   Q   Of 2016.  Stevie Hilliard was in jail then; wasn't he?

19   A   Yeah.  He was in jail.

20   Q   Did you go to the jail to meet Stevie Hilliard?

21   A   No.  I talked to him on the phone.

22   Q   You called Stevie Hilliard, a man that you had not

23   known prior to that, on the phone in the jail?

24   A   No, he spoke with him on his phone and I talked to him.

25   Q   What did you talk to him about?

1  A    About fixing cars.

2  Q    You were talking to a man who was in prison about

3  fixing cars?

4  A    Some of the vehicles belonged to him that Tim Green had

5  at his house.

6  Q    Okay.  Did Stevie Hilliard hire you to work on his

7  cars?

8  A    No.  Tim Green hired me.

9  Q    Okay.  How did Tim Green pay you?

10  A    Money.

11  Q    You said before you were an addict.  Did he ever pay

12  you in methamphetamine?

13  A    No.

14  Q    When you were arrested in June of 2016, you have

15  indicated there was a gun in the car.  Where did that gun

16  come from?

17  A    I don't know, sir.  I am not really sure.  There was a

18  woman inside the vehicle at the time.

19  Q    Who was the woman?

20  A    I am not really sure what her name was.  It's in the

21  police report.

22  Q    Why was she in the car?

23  A    She was getting a ride from where she had broke down

24  at.  A friend asked me to pick her up because her car was

25  broke down.

1  Q    Who asked you to pick her up?

2  A    I think it was Donnie -- Donnie Lee, one of her friends

3  had called me and asked me to pick her up.

4  Q    So you borrowed a car from Tim Green?

5  A    One that I was working on for him, yeah.

6  Q    Did he know you had borrowed it?

7  A    Yes.  He's the one that told me which one to take.

8  Q    They searched your cellular telephone at that point;

9  didn't they?

10  A    They took my phone.

11  Q    Okay.  And you had a number of text messages on your

12  phone that are outlined in the factual basis of the plea

13  agreement.  You are familiar with those text messages on

14  your phone; aren't you?

15  A    Yes, sir.

16  Q    Okay.  So the text messages that are outlined here in

17  your plea agreement, that's true; isn't it?

18  A    I signed it, I guess it's true.

19  Q    Well, you keep saying that, "If I signed it, I guess

20  it's true."  But haven't you told the Judge that some of the

21  things in this plea agreement aren't true?

22  A    Well, not true -- is that some of it I didn't

23  understand.  I didn't realize that it was in it, before I

24  signed it.  No fault on my own.

25  Q    So are you saying that there are things that you didn't

1  know were in here when you signed this plea agreement?

2  A    Like I said, I can't read and write that good.

3  Q    Didn't you tell the Judge that you went over this plea

4  agreement with Mr. Leonard?

5  A    Mr. Leonard.

6  Q    Okay.  And you have been reading along on the screen

7  there, haven't you today?

8  A    Yeah, I've been going over what you say, yeah.

9  Q    You had a text message with Quinton Hatcher.  That's

10  true; isn't it?  You know Quinton Hatcher; don't you?

11  A    I don't know him personally.

12  Q    Well, you had his name in your phone; didn't you?  You

13  text messaged with him; didn't you?

14  A    Most the time I never texted anybody.  Somebody else

15  had done it on the phone.

16  Q    That is not what I asked you.  Did you know Quinton

17  Hatcher or not?

18  A    Yeah.  I know who Quinton Hatcher is.

19  Q    I'm sorry.  What?

20  A    Yes. I knew him.

21  Q    You knew him.  How did you know Quinton Hatcher?

22  A    From jail.

23  Q    From where?

24  A    From jail.

25  Q    From jail?

1    A    Uh-huh.

2    Q    Okay.  And so you had his number in your phone?

3    A    I did.

4    Q    You knew Brian Danner as well; correct?

5    A    Yeah.

6    Q    And you texted Brian Danner; isn't that true?

7    A    If there is a text on there, I must have texted him.

8    Q    You said, (as read) "Bro, I need that 1350 + 300 on gun

9    I could of soils it two days ago but your my boy and try to

10   call your brother he owes me 65 I got to have ulit".  You

11   wrote that; didn't you?

12   A    It's on the phone, I guess I did.

13   Q    In fact, you admitted in your plea that those text

14   messages were about collecting drug proceeds.  That's true;

15   isn't it?

16   A    Yes, sir.

17   Q    You texted Timothy Green; isn't that true?

18   A    Yes, sir.

19   Q    You indicated that those text messages were about

20   dropping off drug proceeds to Tim Green.  Isn't that true?

21   A    I never knew it said that.  But I signed it, so I guess

22   so.

23   Q    Are you saying you never knew your plea agreement said

24   that?

25   A    I never knew it.  That's what I was saying about

1  Mr. Leonard.  He didn't tell me everything.  I would've
2  never signed nothing like that.
3  Q    Well, you sent that text message to Tim Green.
4  A    I'd say it doesn't mean that.  People use that phone.
5  That phone didn't even belong to me that they took from me.
6  It can be proven if they just looked to see who it belongs
7  to.
8  Q    You texted somebody known as Jermy.  That's Jeremy
9  Wilson; isn't it?
10 A    I don't know Jeremy Wilson.
11 Q    You don't know Jeremy Wilson.  Who is Jermy then?
12 A    I have no clue, sir.
13 Q    What about Roderick McMorris, you knew him; didn't you?
14 A    I think that's a typo.  No, sir, I didn't know him.
15 Q    You didn't know Roderick McMorris?
16 A    I had never even seen Roderick McMorris.  I am pretty
17 sure in his plea agreement they took out all these texts
18 that was on his from me and him where --
19 Q    So you have reviewed his plea agreement then?
20 A    No.  I spoke with him.
21 Q    You spoke with him?
22 A    Yeah.  He come through the jail.
23 Q    Okay.  Well, that brings up another question.  You
24 indicated that you had your bunk mate write some of your
25 Motions for you.  Is that right?

```
 1   A    He's wrote all my letters.

 2   Q    Okay.  Did he go over those with you?

 3   A    Yeah.

 4   Q    Who was your bunk mate?

 5   A    Thomas Elliott.

 6   Q    Tom Selleck?

 7   A    Thomas Elliott.

 8   Q    Oh.  Thomas Elliott.  Okay.

 9   A    E-l-l-i-o-t-t.

10   Q    Where were you housed with him?

11   A    I am housed here -- at the Jonesboro Jail.

12   Q    Okay.  And he wrote all those letters for you?

13   A    Yes, sir.

14   Q    Did he give you some advice?

15   A    No.  I don't think no advice.

16   Q    Did you talk to him about your case?

17   A    Not about the main thing.  Just what I wanted to write

18   about.  He knows about whatever I was wanting him to write

19   about.  I had no choice.

20   Q    You said you talked to Roderick McMorris in jail.  What

21   did you talk to Roderick McMorris about?

22   A    He walked up to my door and was saying that my name was

23   on his stuff, and his name was on my stuff, and neither one

24   of us knew each other.

25        And that his lawyer got it straightened out or
```

1  something.  He stayed maybe about five or ten minutes and he

2  left the next day.

3  Q    Do you see any of your other co-defendants at the jail?

4  A    No, sir.

5  Q    None?

6  A    I ain't seen none.

7  Q    You know Mark Morrison; correct?

8  A    I've heard of him.

9  Q    You've heard of him?

10  A    Yes, sir.

11  Q    Okay.  Why would there be text messages to him in your

12  phone?

13  A    If his name is in my phone that's because somebody put

14  it there.  I don't know the name.

15  Q    Somebody put it there.  But you told the Judge that all

16  of this was true and that in those text messages Mark

17  Morrison had contacted you in order to give you drug

18  proceeds belonging to Tim Green; isn't that true?

19  A    I signed it.  Yes, sir.

20  Q    You knew Tracy Arnold?

21  A    I knew of him.

22  Q    Knew of him.  How did you know of Tracy Arnold?

23  A    Same thing, jail.

24  Q    Before or after this case?

25  A    It was before this case.

1  Q    Okay.  So you met him in jail before this case ever

2  came along?

3  A    Uh-huh.

4  Q    Is that a yes?

5  A    Yes, sir.  I met a lot of people in jail.

6  Q    Now, you agreed in your factual basis that you had sold

7  approximately 2 kilograms of crystal methamphetamine per

8  week for Timothy Green for the last two months and you are

9  telling the Judge now that that's false; is that true?

10 A    I'm telling that it is not accurate.

11 Q    Is not accurate?

12 A    Yeah.

13 Q    So you did sell crystal methamphetamine for Tim Green

14 just not 2 kilograms a week?

15 A    I never said that.  I said that I was a junkie and I am

16 a user.

17 Q    What is the truth here?

18 A    The truth is I was a user.

19 Q    Okay.  But you told Judge Greer back in November that

20 you were selling approximately two kilograms of crystal meth

21 per week for Timothy Green?

22 A    I admitted to it and signed it.  Yes, sir, I did.

23 Q    So it was true back then, but you are saying today it

24 is not true?

25 A    I am saying I signed the plea bargain that I shouldn't

1   have signed.

2   Q    And you were under oath in November of 2017 when you

3   told Judge Greer this was all true?

4   A    Yes, sir.

5   Q    And you are under oath here today and you are telling

6   Judge Greer that is not true?

7   A    I'm not saying that it is not true.  I'm saying that --

8   Q    You are not saying that it is not true?

9   A    Yes, sir.

10  Q    Did you know Brian Danner?

11  A    I did.

12  Q    You did know him; right?

13  A    Yes, sir.

14  Q    How did you know Brian Danner?

15  A    We'd been friends for about six months before I went

16  back to jail.

17  Q    Before you went back to jail which time?

18  A    This time here.

19  Q    So you had been friends with him since early 2016 until

20  the middle of 2016?

21  A    Sometime -- I got out in May.  Yeah, I met him in jail

22  again sometime before May, sometime.

23  Q    So you met Brian Danner in jail also?

24  A    A lot of these guys they have on my case I met in jail.

25  Q    Okay.  And you knew that Brian Danner was selling

1  crystal methamphetamine for Tim Green?

2  A    Brian Danner admitted to selling crystal meth for Tim

3  Green.

4  Q    And you told Judge Greer that he was selling crystal

5  meth for Tim Green back in November of 2017?

6  A    Yes, sir.  I did.

7            MR. BOWMAN:  I believe that's all the questions I

8  have.

9            THE COURT:  Anything else, Mr. Fabus?

10            MR. FABUS:  I did have one question, just to

11  verify.

12                    REDIRECT EXAMINATION

13  BY MR. FABUS:

14  Q    When you filed your Motion to Withdraw the plea

15  agreement this last time, had you received the Presentence

16  Report yet at the time that you actually asked to get out of

17  the plea?

18  A    No, sir.

19  Q    It wasn't even prepared yet; correct?

20  A    Yeah, it wasn't.

21  Q    And then I am the one that went over that with you;

22  correct?  You didn't go over that with Mr. Leonard?

23  A    Right.  Correct.

24  Q    Okay.  So you asked out of the plea agreement before

25  you saw the PSR?

1  A    Yes, sir.

2          MR. BOWMAN:  That was it, Judge.

3          THE COURT:  Anything else, Mr. Bowman?

4          MR. BOWMAN:  No, Your Honor.

5          THE COURT:  Mr. Dishner, I just have a few

6  questions.

7              FURTHER EXAMINATION BY THE COURT

8  Q    The Rule says that before you can withdraw a guilty

9  plea, there must be a fair and just reason for that.  So I

10 am going to start where Mr. Fabus started.

11         What is your reason for wanting to withdraw your guilty

12 plea?

13 A    My reason, sir, is that the day of the Court hearing, I

14 admit that I agreed and you spoke with me and you was very

15 clear about me going to trial.  I feel like it was a hasty

16 decision due to me and him arguing the short time that I had

17 to go to trial.

18         That is about, you know, as close to how he -- how

19 Mr. Leonard -- I feel like really at the time that he --

20 when I come in here for the plea -- he filed the Motion to

21 come off my case, plus he was -- I feel like he was more

22 against me than he was for me.

23         So that's why I felt like I was kind of cornered and I

24 went ahead with the plea.  I agreed to things that I

25 normally wouldn't have agreed to.  That's how I feel today.

1  Q   Tell me specifically what Mr. Leonard did or said to

2  you that lead you to the conclusion that he really wasn't --

3  or that he was against you?

4  A   Well, he instead of -- he tried to come off -- he

5  wanted to come off my case due to me wanting to go to trial.

6  And then he explained to you that he felt that --

7  Q   What did he say?  Did he ever tell you that he would

8  not try your case?

9  A   Yes, sir.

10 Q   He told you he didn't want to represent you?

11 A   He said that he was filing a Motion to come off my case

12 because I wanted to go to trial.

13 Q   Why did he say he didn't want to try your case?

14 A   He didn't at first, but once we got in here on the

15 Motion that he read to you, I think it said that we either

16 wasn't getting along or that the relationship could not be

17 mended.  It was too far gone.  Something had happened.

18     Then like I said, he told you that he felt like we was

19 going to put hands on each other the next time we seen each

20 other there.  That I was going to lie at my trial.  That he

21 didn't want to be a part of that.  I mean --

22 Q   Here's what he said, Mr. Dishner.  And I don't think

23 this gives away any confidences at all, but he said, "I

24 certainly have no problem continuing to represent him.  The

25 real problem that I would have is if he decided to go to

1    trial and his plan was to take the witness stand.  That's

2    where I don't want to get into that issue in my Motion to

3    Withdraw."  That is what he said to me.  He never said that

4    you intended to lie at trial; did he?

5    A     No, but I think if you read on through there, I think

6    that is how you insinuated it because --

7    Q     No.  Here's what I told you.  I cut Mr. Leonard off.  I

8    wasn't even going to ask him about that.  What I said to

9    you, "Mr. Dishner, Mr. Leonard has an ethical obligation not

10   to participate in testimony at trial that he knows to be

11   false.  I don't know whether that's what's going on here or

12   not.  I'm not going to speculate much about that."

13        "But all he can do at trial, if you were going to take

14   the witness stand and testify falsely and he knew that, is

15   simply to basically ask your name, and ask you what you want

16   to tell the Court."

17        He can't participate in it any further.  That is what

18   it said; wasn't it?

19   A     Yes, sir.

20   Q     And you interpreted that to mean that Mr. Leonard was

21   accusing you of planning to take the witness stand and lie?

22   A     Well, that's how I took it.

23   Q     Before we even got to that point though, I asked you

24   about your meeting or your contact with Mr. Leonard on the

25   prior Friday where you had indicated to him that you wished

1    to have a trial; correct?

2        And you said to me, "At the time he came and spoke with

3    me, I was explaining to him that I was having problems with

4    the plea agreement, but over the weekend, I went over the

5    plea agreement over and over."

6        "I talked about it with my family, and if I can, I was

7    going to go ahead and take the plea agreement today since it

8    was already signed."

9        And you and I had some more conversation about that,

10   and you made that statement about simply getting it over

11   with.  And I told you I wouldn't in all likelihood accept a

12   plea for you just get it over with; right?

13   A    Yes, sir.

14   Q    And here is what you said to me, "I mean that I'm

15   satisfied with the plea agreement, and I am satisfied with

16   what my lawyer has done, so I think it would be in my best

17   interest to go ahead and plead here today."

18   A    Yes, sir.

19   Q    Now was it true that you were satisfied at that time

20   with the plea agreement?

21   A    I don't believe that I admitted that I was satisfied

22   with it until later on.

23   Q    That is not my question.

24   A    Yes, sir.

25   Q    Was it true that you were satisfied with the plea

```
1    agreement?  You are shaking your head, yes.

2    A    Yes, sir.  I guess.

3    Q    Is it true that at that time you were satisfied with

4    what your lawyer had done?

5    A    I don't know if I was satisfied with what my lawyer had

6    done.

7    Q    Was it --

8    A    I did tell you that I was.  I think just to get it over

9    with.

10   Q    Was it true that you said that it would be in your best

11   interest to go ahead with the plea agreement?

12   A    Yes, sir.

13   Q    All right.  And if it was in your best interest at that

14   time, why is it not in your best interest now?

15   A    I don't know if it is in my best interest in lieu

16   of -- with the plea bargain, due to how things laid out

17   with Mr. Leonard.

18   Q    I'm sorry?

19   A    Due to how things laid with me and Mr. Leonard.  Him

20   wanting to come off my case, because I wanted to go to

21   trial, some of the things he said, but that's --

22   Q    Isn't it true that in November, Mr. Leonard was

23   practically ready to go to trial?

24   A    Sir, I don't think he was or he wouldn't have filed the

25   Motion that he filed.  He filed the Motion two days before
```

1  my hearing to come off my case.

2  Q    You were aware, were you not, that an investigator had

3  been hired by Mr. Leonard after Court approval?

4  A    Yes, sir.

5  Q    You said to either Mr. Bowman or Mr. Fabus that that

6  investigator talked to you on one occasion?

7  A    One occasion, yes, sir.

8  Q    And you are aware, aren't you, that Mr. Leonard

9  represented to the Court that the investigator had been

10  working on the case for a while, and he hadn't been able to

11  find anything that would help you at trial; correct?

12  A    Yes, sir.  That's what he said.

13  Q    You have some reason to question that?

14  A    No, sir.  What I seen with Mr. Bowman, I think, was his

15  name -- he found more that -- I think he found something

16  that was more against me than for me.

17  Q    So he found things that would actually hurt you at

18  trial; is that what --

19  A    I think that's what he said, yes, sir.

20  Q    Mr. Leonard clearly advised you to accept this plea

21  agreement.

22  A    He said it was in my best -- he felt that I should take

23  it.

24  Q    And he told you that if you went to trial and were

25  convicted on all these charges, you could get a life

1  sentence; correct?

2  A    Yes, sir.

3  Q    You wouldn't want a lawyer to tell you anything other

4  than the truth; would you?

5  A    No.

6  Q    You have said today that you always wanted a trial in

7  this case; correct?

8  A    Other than the time that he brought the plea bargain to

9  me and within that hour I signed it.  That was about the

10  November the 17th at trial, I agreed with you.

11  Q    And I'm puzzled why you think a plea agreement that

12  results in a 188 to 235 month guideline range -- of course

13  that might not be the ultimate range.  I know you can make

14  objections to the report, and you said some things in the

15  report you thought were incorrect.

16       But, let's assume for a minute that that's a 188 to 235

17  month guideline range.  I tend to agree with Mr. Leonard

18  that if you took the case to trial and you lost, you are

19  probably looking at something closer to life, if not life.

20       Those are the kinds of things that have to be taken

21  into account in deciding whether to plea or not.  Do you

22  understand that?

23  A    Yes, sir.

24  Q    Those are things you took into account and then

25  Mr. Leonard advised you to think about it; correct?

```
1   A    Yes, sir.

2   Q    And if you had taken this case to trial, just tell me,

3   generally, what your defense would have been?

4   A    Some of the statements, some of the drug quantities

5   doesn't match.

6   Q    But how would you have proven that?

7   A    Well, the only way I could have proved it was to show

8   that what -- the time I was home, the 38 days I was at the

9   halfway house for two weeks of that, and everybody knows I

10  wasn't selling keys of dope in a halfway house.

11  Q    Everybody knows that?

12  A    Everybody knows that I wouldn't have been doing no such

13  thing.  That's my -- I agreed to this weight on this

14  distribution.

15       I feel like I made a hasty decision when I wanted to go

16  to trial because I am not guilty of it.  I have always pled

17  to my charges.

18       My whole life I've never took nothing at trial.  I have

19  never fought it.  I have always said, "Yeah, I am guilty."

20  And I've gone to prison and I went.  I spent every day --

21  day for day.  I never took no paroles.  This here I am not

22  guilty of.

23  Q    Now you are willing to say you are not guilty of this?

24  A    I am guilty of some of it.  But I am not guilty of

25  what's being said.  That's how I feel, you know, of what
```

1  went before the plea bargain.  The plea bargain, that is

2  what I meant.

3  Q    You had almost a month to think about this plea

4  agreement after you signed it; right?

5  A    Yes, sir.  I talked to him maybe two and a half weeks

6  later.

7  Q    And during that time you talked to your family?

8  A    Yes, sir.

9  Q    And your family thought it was in your best interest;

10  right?

11  A    Well, I said that just to -- I did say it, just to get

12  it over with.

13  Q    Is that what they thought?

14  A    No.  Because my family knows that I wasn't involved in

15  what is being said.

16  Q    You also told me that during that period of time you

17  have been listening to and taking the advice of a jailhouse

18  lawyer; right?

19  A    Yes, sir.  I did.  He was more -- some of the case laws

20  I was looking at and I got off track.  I was looking at the

21  wrong -- at some wrong cases and it didn't really pertain to

22  mine, and we got that straightened out real quick.

23       Like I said, I can't read and write that good.  People

24  have to explain things to me.  Sometimes I allow people to

25  tell me some information that I shouldn't go with.

1    Q    I think you just answered one of my other questions.

2    This Presentence Report indicates that on 23 different

3    occasions as an adult you have been convicted of a criminal

4    offense.  Is that essentially correct?

5    A    I think some juvenile offenses --

6    Q    Well, there are seven more juvenile, but I am talking

7    about the adult criminal convictions.

8    A    Yes, sir.

9    Q    It indicates there is another 12 or 13 that were

10   dismissed for one reason or another.

11   A    I think so, sir.

12   Q    So since you were 18-years-old you have been charged

13   with a criminal offense on -- what's that make, 35 or so

14   occasions?

15   A    Probably so.

16   Q    That's a lot of experience with the Criminal Justice

17   System; right?

18   A    I guess.

19   Q    And you said that every time there was a conviction

20   here you plead guilty -- in other words, you have never

21   taken a case to trial; right?

22   A    Yes, sir.  I have always -- if I was guilty of it, I

23   would plead to it and went on to prison.  I never not once

24   wanted to go to trial because I was guilty of driving.  I

25   was guilty of the theft over a thousand.  I was guilty for

1  not appearing in Court.

2  Q    Well, it is not just that.  Mr. Bowman is right about

3  that, there is 23 of them.

4  A    Yeah, I think it's DUI's, one misdemeanor assault,

5  DUI's, failure to appear in Court, theft over a thousand.

6  Q    Multiple ones.

7  A    Two thefts over a thousand, three DUI's, failures, and

8  two failure to appear, or failure to appears.  I have had

9  some misdemeanor and some juvenile time.

10 Q    I am having a hard time hearing you, Mr. Dishner.

11 Speak up.

12 A    I've had some misdemeanors and juvenile offenses

13 whenever I was a kid.  I come from a broken home.  I took

14 alcohol to try to deal with my depression.  That is what it

15 lead to, my criminal history.

16 Q    The point is you have spent a lot of time in a

17 Courtroom; haven't you?

18 A    Yes, sir.  Yes, I have.

19 Q    How old are you now?

20 A    I'm 36.

21 Q    So you've averaged more than one criminal conviction a

22 year since you were 18-years-old; correct?

23 A    Yes, sir.

24 Q    How much time in the last 18 years have you spent in

25 prison or in jail?

1  A    Out of the last 18 years, I have probably spent the

2  past 15.

3  Q    More than 15 years of it?

4  A    Out of the 18 years, I have probably spent from the

5  time I was 18, I've spent until I was 30 -- 32 --

6  Q    I'm sorry.  I didn't follow you.

7  A    From the time I was 18-years-old or 19, I went into

8  prison for theft of property and failure to appear in Court.

9  And then DUI, then failure to appear in Court, that's what I

10 went to prison for.

11 Q    My question is -- how much of the last 18 years have

12 you spent in prison or in a local jail?

13 A    Probably the past 12 or 13 years.

14 Q    So about two-thirds of it?

15 A    Two-thirds of it, yes, sir.

16 Q    Mr. Dishner, if I allow you to withdraw this guilty

17 plea and you go to trial, and you get convicted, and you end

18 up with a non-parolable life sentence, are you going to be

19 content with that result?

20 A    Yes, sir.

21 Q    I don't believe anybody would be content with a life

22 sentence, Mr. Dishner.

23 A    I don't feel like I'd get a life sentence.  I feel like

24 the evidence will show that I'm not guilty of what they're

25 saying.

1  Q     Here's the problem.  You know I defended cases for a
2  long time, Mr. Dishner.  When the jury hears about those
3  statements that the officers say you made to them, more
4  likely than not they will believe those statements.
5      And based on those statements alone, they could convict
6  you of everything that you have been charged with here.  If
7  you are convicted of everything you have been charged with
8  here, the guideline range is likely going to come out at
9  life.
10 A     Yes, sir.
11 Q     And that is the kind of thing that Mr. Leonard wanted
12 you to take into consideration.  But you are telling me you
13 want to take that risk?
14 A     Yes, sir.
15 Q     All right.
16          THE COURT:  Anything else from Mr. Dishner?
17          All right.  Mr. Dishner, you can go back to the
18 table beside Mr. Fabus.
19     (The witness left the stand.)
20          Is that your only witness, Mr. Fabus?
21          MR. FABUS:  Yes, Your Honor.
22          THE COURT:  All right.  I will be glad to hear
23 your argument on the Motion.
24          Well, I didn't ask Mr. Bowman.  Any proof from the
25 Government?

1          MR. BOWMAN:  I was going to offer some brief

2     proof, Your Honor.

3          THE COURT:  All right.  I'm sorry.  Go ahead.

4          MR. BOWMAN:  Quite frankly, I don't think the

5     Defense met its burden, but out of an abundance of caution I

6     wanted to --

7          THE COURT:  All right.  Go ahead.

8          MR. BOWMAN:  I will call Agent Shannon Russell and

9     I will try to keep this brief.

10          THE COURTROOM DEPUTY:  Do you solemnly swear the

11     information you are about to give in the case before the

12     Court will be the truth, the whole truth, so help you God?

13          MR. RUSSELL:  I do.

14          THE COURTROOM DEPUTY:  Please be seated.

15                    SHANNON RUSSELL,

16          the next witness, having been duly sworn,

17            was called on behalf of the Plaintiff,

18            was examined and testified as follows:

19                 DIRECT EXAMINATION

20     BY MR. BOWMAN:

21     Q    Will you state your name for the record, please?

22     A    Shannon Russell.

23     Q    Where are you employed?

24     A    The Second Judicial Drug Task Force.  I am also -- I am

25     employed with the Sullivan County Sheriff's office.

1  Q    Okay.  How long have you been with the Drug Task Force?

2  A    Since 2014 -- November of 2014.

3  Q    How long have you been in law enforcement?

4  A    I started working for Santa Barbara, California in '96.

5  Q    Okay.  So prior to that you were in active military

6  service?

7  A    Yes.

8  Q    Now, as part of your training for the Drug Task Force

9  have you been trained in and also been involved in numerous

10  interviews of potential targets of your investigations?

11  A    Yes, I have.

12  Q    And part of that training is learning how to ask

13  questions, to follow up questions to determine whether or

14  not a person is being truthful with you?

15  A    That is correct.

16  Q    You also observe their body language and use that to

17  interpret whether someone is being truthful with you in

18  giving a statement?

19  A    Yes.

20  Q    Okay.  Now, you have heard some discussion about a

21  July 13, 2016, statement by Mr. Dishner?

22  A    Yes.

23  Q    Were you present for that?

24  A    Yes.

25  Q    Who else was present for that?

```
 1   A    Agent Rourke -- Jason Rourke, and ATF Agent Jamie

 2   Jenkins.

 3   Q    Okay.  Now, Agent Rourke is also with the Drug Task

 4   Force?

 5   A    That is correct.

 6   Q    And then Agent Jenkins, of course, which you indicated

 7   was with the ATF.

 8   A    Correct.

 9   Q    Now, when you interviewed Mr. Dishner, where was that

10   interview located?

11   A    The Sullivan County Sheriff's Office.

12   Q    Was that following his arrest then that we've discussed

13   where he was pulled over in a vehicle with a firearm?

14   A    That is correct.

15   Q    Okay.  Now, Agent Russell, did the Defendant,

16   Mr. Dishner, receive any Miranda warning?

17   A    He was.

18   Q    Was that prior to you questioning him?

19   A    Yes.

20   Q    Was that a written Miranda warning?

21   A    It is a printed form that we read, initial -- what we

22   do is we take the information, his name, provide the

23   address, phone number, date, and time, and then we read the

24   form to him verbatim.

25        Then we explain to him that we need his initials beside
```

1   each one if he understands his rights, which he advised he

2   did.  And he doesn't have to speak to us.  He can stop.  We

3   also explained that he can stop the interview at any time.

4   Then we have him sign the form.

5   Q    Is that the protocol that you use in every interview

6   that you do of a target of an investigation?

7   A    That's correct.

8   Q    Now, on this occasion did Mr. Dishner go through and

9   initial that form as you have indicated?

10  A    That's correct.

11  Q    And he signed that waiver form as well?

12  A    Yes.

13  Q    Okay.  Do you recall specifically who read the form to

14  him?

15  A    Typically, I do, because I am the one writing the form.

16  So I would assume it was me.

17  Q    Okay.  So in these interviews typically if you are with

18  Agents Rourke and Jenkins are you typically the note taker?

19  A    Usually, yes.

20  Q    Okay.  In fact, the written or typed summary of the

21  interview, did you actually prepare that as well?

22  A    I did.

23  Q    And Agent Russell, did you ask Mr. Dishner for his

24  address?

25  A    Correct.

1  Q    Did you write that down on the Miranda waiver form?

2  A    I did.

3  Q    Did you ask him to sign that form?

4  A    Yes.

5  Q    Did he sign that form?

6  A    He did.

7  Q    Did you note anything about the address that he

8  provided on that Miranda form?

9  A    At the time, I honestly didn't pay attention to it.  It

10 wasn't until I was preparing to come up here I happened to

11 notice the address was not one that I was familiar with him,

12 that was in his history.

13      So today I just looked at it, I put it in CRMS -- which

14 is the Tennessee law enforcement portal.  I typed that

15 address in and it came up to -- associated with a Virginia

16 Hammonds.

17      In looking on Facebook, I just happened to see that it

18 appeared that she was his girlfriend and she had that

19 address listed as her address at one time.  And then there

20 was some entries made on Facebook that made it appear that

21 they were still maybe together.

22 Q    And that's the address he provided to you for a

23 residence?

24 A    That is correct.

25 Q    Now, when you began interviewing Mr. Dishner about his

1  involvement in this methamphetamine conspiracy, did he

2  provide you information that you were already aware of?

3  A    That's correct.

4  Q    Okay.  And just in general, what types of information

5  did he provide you that had been corroborated by other

6  investigations that you had performed?

7  A    The names, specifically, Steven Hilliard, Timothy

8  Green, Tracy Arnold, Quinton Hatcher, Brian Danner, then

9  there was another.  I think Mark was listed, but I am not

10 sure if he was talking about Mark Morrison at the time.

11 Q    Those were names that you also uncovered in doing a

12 search of the Defendant's phone that he had with him at the

13 time he was arrested?

14 A    I did not actually do the physical search of the phone.

15 Q    Okay.

16 A    But I believe it was discovered later, yes.

17 Q    Now, what in particular about the involvement of those

18 individuals that he mentioned was consistent with your

19 investigation?

20 A    The fact that he had met or had spoken with Steven

21 Hilliard.  Steven Hilliard was arrested in April of 2016 in

22 Georgia, brought back to Sullivan County on a warrant.

23      So we know that he was in jail in April at a time the

24 Defendant was released, Mr. Dishner.  So we surmised that

25 they had had some opportunity to talk.  He had said that he

1   had gotten the information from Steven Hilliard how to

2   contact Timothy Green.

3        He says that he had contacted Timothy Green but was

4   unable to get him to return his calls.  In doing so, he was

5   out with some female -- I don't recall her name or if he

6   even mentioned it.  He was -- the person selling the dope to

7   them was -- or that girl -- was selling it to the girl --

8   was Tracy Arnold.

9        So in talking with Tracy Arnold, he had somehow

10  discovered that Tracy Arnold was working with Tim Green.

11  And he had basically made Tim Green -- made Tracy Arnold

12  take him to Tim Green; which upset Green a lot according to

13  him.  At that point they, I guess, they continued their

14  involvement with one another.

15  Q    The address that is contained in your case statement

16  about Timothy Green's residence, 234 West Carters Valley

17  Road; is that an address that Mr. Dishner provided to you?

18  A    I don't think he provided the physical address.  He

19  provided the description which matched that address at 234

20  West Carters Valley Road.

21  Q    Okay.  And did he describe in particular some

22  methamphetamine that he had seen at Timothy Green's

23  residence shortly before his arrest?

24  A    He advised that he had helped Timothy Green offload

25  some methamphetamine.  He gave an approximate amount -- I

can't remember -- I think it was six to ten kilos. And in
doing so -- we had just served a search warrant on the 29th
of June at Timothy Green's residence along with Joseph
Tranum, who lived in the upper end of the County in Hickory
Tree.

Myself and Agent Rourke had offered those search
warrants based on a traffic stop conducted by THP on Highway
11W, and a supplier of methamphetamine from Georgia had
brought methamphetamine to them and was on the way back and
had a large amount of cash.

Q    And that was Nathan Hogan?

A    That was Nathan Hogan and Misty Borders.

Q    Okay.

A    So we had already targeted or were looking at both
Tranum and Green as potential targets and we were going to
further our investigation. This kind of jump started
things, put it into fast momentum.

So we offered the search warrants. We conducted those
search warrants on the morning of the 29th of June. In
doing those search warrants we discovered a safe in Tim
Green's house that had methamphetamine packaged a particular
way. It was wrapped in green shrinkwrap. It had numbers
written on the outside of them.

Q    Did the numbers correspond to anything?

A    They did. In interviewing Mr. Dishner, I asked him to

1   describe how -- he had said that he had helped Tim Green to

2   offload some meth several days prior to the search warrant

3   he had heard about.

4       So I asked him to describe, "In that particular

5   incident, how was the methamphetamine packaged?"  And in his

6   statement he described exactly what we had discovered in Tim

7   Greene's residence.

8       I can't say it's the same meth, but it was packaged the

9   same way.  Had the numbers written on the outside to include

10  one and five-hundred, I believe, which we believe was the

11  amount that it weighed in kilograms.

12  Q    Okay.  Now, so when you conducted the search warrant at

13  Tim Green's residence you indicated the methamphetamine that

14  was recovered from a safe was packaged in a green shrinkwrap

15  and it had numbers written on it?

16  A    Correct.

17  Q    And that's the same type of information or the same

18  information that Mr. Dishner provided to you about meth that

19  he had unloaded --

20  A    Yes.

21  Q    -- at Timothy Green's residence?

22  A    Or at least the same style packaging, yes.

23  Q    Okay.  Did you tell Mr. Dishner that that's the type of

24  packaging that you had found during the course of the

25  search?

 1   A     I don't recall that we mentioned -- we are actually

 2   kind of surprised that he had said that, and that, for us,

 3   was a big ah-ha moment.

 4   Q     Okay.  Is this -- if you will look at the monitor.

 5         (Document displayed on the computer screen.)

 6   BY MR. BOWMAN:

 7   Q     Is that your summary of the interview of Mr. Dishner?

 8   A     Yes.  That is Page 1.

 9   Q     Okay.  And then is that Page 2?

10   A     That is correct.

11   Q     Okay.

12         MR. BOWMAN:  Your Honor, I would like to make that

13   an Exhibit to Agent Russell's testimony.

14         THE COURT:  All right.  Let's mark it as Exhibit

15   No. 1.

16      (Exhibit No. 1 was admitted.)

17         MR. BOWMAN:  Thank you.  That's all the questions

18   I have.

19         THE COURT:  All right.  Mr. Fabus?

20         MR. FABUS:  I don't have any questions, Judge.

21         THE COURT:  All right.  Mr. Russell, thank you

22   very much.  You may step down.

23         THE WITNESS:  Thank you, sir.

24      (The witness left the stand.)

25         THE COURT:  Anything else, Mr. Bowman?

```
 1            MR. BOWMAN:  No, Your Honor.  Thank you.

 2            THE COURT:  Anything else, Mr. Fabus?

 3            MR. FABUS:  No, Judge.

 4            THE COURT:  All right. Now I would be glad to hear

 5    your argument.

 6                         CLOSING ARGUMENT

 7                          BY MR. FABUS

 8            This is a rather unique position for me to be in,

 9    Judge, because as Mr. Dishner's attorney, I am doing exactly

10    what he is requesting that I do.

11            And if you were to grant the Motion, it would

12    really concern me that I could be marching him to a life

13    sentence.  But, ultimately, that ends up being his decision.

14    That's not my decision.

15            I am not a Guardian Ad Litem like we have in

16    custody cases where I just do what's best for my client.  I

17    have to try to explain to him what the options are and some

18    of these decisions ultimately end up being his.  Then I just

19    have to advocate to the best of my ability.

20            And reading the Government's Motion, you know I

21    filed my brief and we all hit the exact same points and I

22    can't straight-faced tell you that if you just start

23    counting the different six or seven elements that they've

24    got that there is going to be more on my side than there is

25    going to be on Mr. Bowman's side.
```

1      This would be a tremendous waste of the
2  Government's resources and your time.  Because you already
3  tried this case.

4      Additionally, I am really between a rock and hard
5  place in that I can't really maintain innocence or I am
6  having him perjure himself after he did his change of Plea
7  Hearing.  So there are two of them that are going to weigh
8  quite heavily against me in those factors.

9      But I do think there's one of the other factors
10  that weighs in my favor, if not strongly in my favor, Judge.
11  And I think that's the fourth factor.

12      When we just look at the circumstances underlying
13  the entry of the guilty plea.  And I would point out when we
14  look at these six or seven factors, the case law says it is
15  a general non-exclusive list and no one factor is
16  controlling.

17      And if we actually read the language of the
18  Federal Rule of Criminal Procedure that governs this, it
19  says that the Rule is designed to allow a hastily entered
20  plea made with unsure heart and confused mind to be undone.

21      Not to allow a Defendant to make a tactical
22  decision to enter a plea, wait several weeks, and then
23  obtain a withdrawal if he believed he made a bad choice in
24  pleading guilty.

25      I don't think that's what happened here at all.  I

1  think he was back-and-forth with it all along.  I can

2  understand why Mr. Leonard was strongly encouraging him to

3  sign it.

4          Judge, when I first started meeting with

5  Mr. Dishner to be honest, I was taking the same approach

6  and you can see I ended up quickly in the same position

7  Mr. Leonard was in, and then he fired me from the case a

8  couple times.

9          When I have just taken the approach that it is his

10  decision and I explained it to him.  And I am just going to

11  try to advocate for what he wants me to, we have actually

12  gotten along fine for the last month.

13          When we look at just the unique circumstances of

14  this, it was November the 17th, and I think the trial was

15  like December the 5th, it was less than three weeks out.

16          And he shows up at Court, and Judge you handled it

17  perfectly.  I know -- I have seen you before and when

18  somebody is hesitant at all, you re-set them to make them

19  come back.  And I remember wondering why you did that,

20  because it almost seemed too cautious.

21          Now I can see why.  I have seen you do that

22  before.  And that really wasn't an option on this one,

23  because the trial was three weeks out with what we were

24  looking at time frame-wise.  It just wasn't realistic to do

25  that, and I think it was the week before Thanksgiving,

probably even complicating it further.

But, for Mr. Dishner's viewpoint, he shows up that day to Court, and it is in the transcript where Mr. Leonard said, "We may end up in a fistfight." It was that contentious between the two of them.

And he hears his attorney say that to the Court. And I know Mr. Leonard did not tell the Court, "Well, if he gets on the stand he is going to perjure himself."

But when I read it, that was my honest -- I understand how attorneys have to word stuff, but I can see how Mr. Dishner was under the impression that that was being said. Because I think that is how a lot of people -- I think a lot of people would probably read it like that. Even though that wasn't quite what was being said.

So just between the way that happened and he had already tried to -- it was just -- this is just a really odd set of circumstances. Where I look at that one factor, and I think it will be in your discretion -- I mean if you rule against me on this I don't think I will have a chance on appeal. Because I think it's going to be in your discretion either way you look at it.

He would like to be able to go to trial whether or not that's in his best interest. It is his decision, so I am here advocating for you to allow him to withdraw from it -- from his plea and it would really just be on the basis

1  of that one factor.  Because I don't think any of the others

2  -- at best, they are neutral.  I don't think the other ones

3  would weigh in my favor.

4         THE COURT:  The thing that troubles me about that

5  argument is this, the Rule makes it clear that a Court

6  should not allow a Defendant for tactical reasons to enter a

7  guilty plea and then come back later and say, "I was hasty.

8  I was unsure."

9         And it almost appears to me that that's exactly

10 what Mr. Dishner has done, because for whatever reason he

11 indicated to the Court quite clearly and unequivocally on

12 the 17th of November that he thought it was in his best

13 interest to go forward.  And then about a month and a half

14 later he writes a letter saying, "I want to withdraw it."

15        I don't think I get to the prejudice to the

16 Government issue unless the other factors weigh in favor of

17 Mr. Dishner.  But to allow a Defendant to do that raises the

18 potential for serious prejudice to the Government doesn't

19 it?

20        I mean these other Defendants who presumably would

21 have testified against him have all been sentenced.  They

22 are all --

23        MR. FABUS:  I can't argue otherwise, Judge.

24        THE COURT:  -- in BOP custody.  The Government may

25 or may not be able to get them here for a trial.

1          MR. FABUS:  I can't straight-faced argue

2    otherwise.  I just -- well, I guess that is how you are

3    saying it was a tactical decision.  I guess with how I was

4    looking at it, I didn't see where there was a tactical

5    advantage to us doing that.

6          But just me looking at the proof that the

7    Government had against him, even without other people coming

8    back and testifying, I didn't see where that was going to

9    help me with his statement, with the cell phone, with -- the

10   car was somebody else's car.  I think it was stolen.  But

11   the drugs and gun that were found in the car.  I didn't see

12   where any of that changes any of it.

13         But with what you are saying and that's a good

14   point.  I am not going to say it's not.

15         THE COURT:  And it is not like he is inexperienced

16   with the Court System.  He has been in the Court System a

17   lot.  And I realize that was in State Court and this is

18   Federal, but your basic rights are the same in both.

19         So certainly, I think the Government could make a

20   case if it wanted to that this was an experienced criminal

21   who appeared before the Court in November of 2017, who

22   sought a tactical advantage by entering a guilty plea that

23   he later sought to withdraw.

24         And here we are another six months down the road.

25   I mean, I guess that all weighs in on whether or not I can

find that this really was a hastily entered into guilty plea

or not.

I don't remember the exact date he first appeared

before the Magistrate Judge.  But it was in the first

quarter of the year.

MR. FABUS:  I think it was.

THE COURT:  So five or six months pass before he

ever signs this plea agreement.

MR. FABUS:  I think that is accurate, yes.

THE COURT:  And then he's got 30 days to think

about it before he actually comes into Court, and he

unequivocably tells me that he is satisfied with his lawyer.

He thinks the plea agreement is in his best interest.  He

wants to go forward.

He never once said to me, "Oh, I'm concerned that

if we go forward -- I've got to go to trial on December" --

whatever it was.  He has been around the Criminal Justice

System enough to know that continuances can be granted.

MR. FABUS:  The only thing I can point to in the

transcript, Judge, was I just saw the two occasions where he

was like, "I am just ready to get it over with."

And as soon as you heard that the second time,

that was when you stopped and at that point on, I guess,

from my point of view, all I can offer the Court is just

from that point on, he just said what he needed to say to

1   get it over with.

2           But you handled everything well that day.  I mean,

3   you couldn't have done it any differently, Judge.

4           THE COURT:  And in thinking back on it, other than

5   tell him that if he was dissatisfied with Mr. Leonard, if

6   Mr. Leonard did not want to go to trial, thought the

7   relationship was irretrievably broken, that I would grant

8   him a continuance.  But beyond that, I don't know what I

9   could have done more to try to assure that his plea was

10  knowing and voluntary.

11          MR. FABUS:  I didn't even try to mention anything

12  in my argument, Judge, or in my briefing.  Because I -- and

13  I knew what you were like.

14          That was one of the hiccups I had early on with

15  him because I waited to file the transcript requests.

16  Because I know what you are like during Change of Plea

17  Hearings.  Not just from my experience, but from watching

18  others sometimes when we are sitting here in Court.  And

19  then I had spoken with Mr. Leonard, and asked if there was

20  anything abnormal about the change of plea.  And he had told

21  me that there wasn't.

22          That you how handled it like you always did.  That

23  is why I waited a month to even order the transcript.  I was

24  trying to save those costs.

25          THE COURT:  All right.  I interrupted your

1 argument. Go ahead.

2          MR. FABUS: Judge, I have probably said about all

3 I can say. And I hit the same points in the memo that I

4 filed. But I think that is probably about all I can say.

5          THE COURT: All right, Mr. Fabus, thank you.

6          Mr. Bowman?

7                    CLOSING ARGUMENT

8                    BY MR. BOWMAN

9          Your Honor, I am not going to stand here and

10 belabor the points I have already made in my memorandum.

11          I would like to point out though, that essentially

12 what the defendant posits here today is, he essentially

13 attempted to manipulate the Court, and it would appear that

14 he has continued that.

15          This proposal that he said what was needed to get

16 through this change of plea at that point in time is a

17 manipulation of the Court. That, I think, does not ring

18 true, however, when we look at the circumstances.

19          Mr. Fabus aptly points to the fourth factor as

20 being important in this particular situation. That being

21 the circumstances underlying the entry of the plea of

22 guilty, which the Defendant certainly focused on in his

23 testimony.

24          And the reality is that we have a Defendant, as

25 this Court just indicated, that is very familiar with the

Judicial System.  And he's not timid.  He is somebody who
has sent multiple letters to the Court raising concerns.
And those concerns were addressed by the Court on each and
every occasion.

So he has demonstrated he's not afraid to say,
"Hey, wait," when he's got a concern about the System.  He
is not somebody that is timid and is going to just take his
lawyer's advice wholesale.

No, he talked to his jailhouse lawyer.  He talked
to his bunk mate.  He has talked to his family.  He didn't
take anything as wholesale.  In fact, they apparently had
very heated arguments.

Yet he expects the Court to believe that he came
here under oath and manipulated the Court into taking his
plea that day, November the 17th of 2017, because he just
wanted to get it over with.  Because he was somehow
confused, or scared, or what have you.  And that just
doesn't ring true based upon the experience of this
Defendant.

In contrast, I think his initial appearance before
Judge Corker was around March of 2017.  He was writ'ed in.
And of course, and I am sure the record bares this out.
Judge corker advised him of the maximum penalty he was
facing.  I am sure Judge Corker advised him the significance
of the gun charge, and how that would be a consecutive

sentence.

So he was well aware of the penalties.  And, Your Honor, Dave Leonard is no stranger to this Court.  I've had probably more cases with David Leonard than anyone other than the Federal Defender Services in this Court.  He has probably tried as many cases before this Court as any other panel attorney.

Clearly, very experienced and I'm sure would have advised Mr. Dishner about the penalties that he was facing.  Would have advised him properly about the risk of going to trial without any sugarcoating of it.

And the Defendant then appears before the Court with all of that behind him and having previously requested that Mr. Leonard be removed from his case.

Citing at one point to the failure to file Motions, even though I think the record will bare out that David Leonard filed more Motions than any other attorney.  In fact, I can't specifically recall, other than some just boilerplate Motions, anybody else having filed any Motions of any significance of this case.

That Motion ultimately is ruled moot by Judge Corker because the Defendant got before Judge Corker and decided -- not as the Defendant indicated on the witness stand that essentially Judge Corker told him, "You've got the best lawyer.  You need to learn to get along."

1    But the Defendant had indicated that he was able

2  to get along the Defendant -- the Defendant had indicated

3  that he was able to get along with Mr. Leonard and was

4  satisfied with his representation.

5    Those are rather cursory actions in that -- that

6  is a routine thing for Judge Corker to deal with.  A request

7  for a new attorney numerous times are baseless.  Most of

8  them are probably baseless, but often those are granted.

9  There would have been a good reason not to grant this one.

10    And then, obviously, and I'm not privy to the

11  hearing between the Court with Mr. Leonard and the Defendant

12  prior to the change of plea, other than what I have heard

13  the Court recite today, and what I saw recited in the

14  Defendant's memorandum.

15    But it's clear from that that the Court was very

16  thorough when questioning the Defendant about Mr. Leonard's

17  representation and had there been any real concern about

18  that representation, the Court would not have gone forward

19  that day.

20    You went beyond your typical plea colloquy.

21  Multiple times you asked the Defendant about the certainty

22  with which he was entering this plea.  You made extra

23  efforts and you always go through a very thorough colloquy.

24  But on this occasion you made even more efforts to make sure

25  that the plea was knowing and voluntary.

He agreed, of course, that the plea agreement and factual basis were accurate. He initialed each and every page of the plea agreement. And that plea agreement was the second plea agreement that he had received. There had been a negotiation process.

He had first received the plea agreement in July of 2017. Mr. Leonard had requested changes to that. And I think that the Court would likely know, particularly based on the statement that he made to three Agents, that the plea agreement that the United States offered the Defendant was exceedingly fair. And that the United States exercised the discretion to be exceedingly fair with regards to Mr. Dishner's plea.

Never the less, given the tenor -- given the fact that he had on multiple occasions apparently had these arguments, these disagreements with Mr. Leonard; I was preparing to go to trial. I assumed that we would likely go to trial in this case until after that plea was ultimately entered on November the 17th.

And certainly this was not one of those occasions where a plea agreement is signed and one simply can sit back and coast with the expectation that there won't be a trial. We were already getting ready for the trial of Mr. Potter. There would have been a lot of overlapping evidence in this case had we gone ahead with the trial.

1    Certainly, I know the Court is -- you have heard

2    the testimony here today and would have recognized many of

3    the names, would have recognized a lot of scenarios from the

4    Potter trial because they overlap.

5    And so you have a situation were the Defendant has

6    avoided a 60 month minimum mandatory consecutive.  He has

7    avoided a much higher quantity of methamphetamine that he

8    admitted to Agents.  I'm sure that's -- apparently that's

9    his contention that that's not an accurate amount.

10    The simple fact is you had three Federal -- you

11    had one Federal Agent, two Drug Task Force Agents that would

12    have been prepared to testify to the truthful -- or to the

13    count that the Defendant related to them about these

14    quantities.

15    And those quantities are corroborated by what they

16    found in Tim Green's residence, by what they found in Joe

17    Tranum's residence, by the testimony of Nathan Hogan, who

18    testified in Mr. Potter's trial about the kilograms of

19    methamphetamine that was coming into East Tennessee.  And he

20    was providing to Mr. Dishner, and Mr. Green, and Tranum, and

21    Stevie Hilliard, and all these other individuals in East

22    Tennessee.

23    So I think there is every expectation to believe

24    that there would have been a finding of guilt by a jury.

25    And I think looking at all this background, I think it makes

1    it clear that even the fourth factor does not weigh in the

2    Defendant's favor in this case.

3         I am not going to go back through all the other

4    factors.  I have covered them all in my memorandum.  I think

5    they all weigh in favor of the United States.  And that the

6    Defendant should not be permitted to withdraw his guilty

7    plea in this case.

8         But I am happy to answer any questions that the

9    Court may have.

10         THE COURT:  The only one I have is this,

11    Mr. Bowman.  As I said a few minutes ago, I think the case

12    law indicates that I never get to the issue of prejudice to

13    the Government --

14         MR. BOWMAN:  Correct.

15         THE COURT:  -- unless I find that the other

16    factors weigh in favor of allowing the withdrawal of the

17    plea.  Talk to me a bit about prejudice to the Government.

18    Is Mr. Potter the only Defendant left to be sentenced?

19         MR. BOWMAN:  That is what I was about to say,

20    Judge.  I believe Mr. Potter and Mr. Dishner are the only

21    Defendants that have not yet been sentenced in this case.

22         The vast majority of the Defendants in this case

23    were in a position to testify.  Certainly, those who would

24    have provided information about the Defendant would have

25    been numerous.

1        The fact is that once somebody testifies -- excuse

2    me -- or once somebody has been sentenced their incentive --

3    even though there's that potential for a Rule 35 Motion --

4    their incentive to testify once the case has been sentenced

5    and it is over and behind them, I think goes down

6    dramatically.

7        We are talking about an extensive loss of time

8    here.  You will recall that during testimony of -- I believe

9    Ms. Borders, and at least one or two other witnesses --

10   there were some memory issues at trial.  There were some

11   issues about it, because quite frankly so much time had

12   passed by.

13       I mean we are talking about two years almost since

14   this Defendant was arrested initially.  We are talking about

15   as much as three years and more since this conspiracy began.

16       Many of these Defendants have already been

17   imprisoned for a year to two years at this point.  Memories

18   fade.

19       And as I indicated before, there would have been

20   tremendous overlap in the testimony and the witnesses called

21   for the trial of Mr. Dishner and Mr. Potter.

22       There was that common thread here.  Common threads

23   of Nathan Hogan, Timothy Green, Steven Hilliard, and there's

24   so many commonalities here that certainly there would have

25   been a lot of overlap.  And so, I think, that the detriment

1   to the United States is significant just from a witness

2   standpoint.

3           You also look at:  The time to prepare for trial;

4   the time and expensive of flying witnesses in; of vouchers;

5   the Court's time; calling another jury in; and all that, I

6   think you are looking at a tremendous expense to the United

7   States, the taxpayer as a result, if this plea were to be

8   set aside.

9           THE COURT:  And I understand that you have to

10  cover all the bases.  I guess 35 years or so ago when I

11  started practicing law, I can envision a case like this, the

12  prosecutor calling the law enforcement officers to testify

13  about those statements and then daring the Defendant to

14  testify.

15          I mean, a three-time convicted felon with other

16  misdemeanor convictions involving dishonesty.  But I

17  understand.

18          MR. BOWMAN:  I would have had real heartburn about

19  this case going to trial.  There is -- and I don't recall

20  the author -- it was an attorney.  It was an Attorney

21  General, I think back in the 1920's that authored, I

22  believe it was a speech to US Attorney's.

23          It's not frequently enough cited.  But it talks

24  about the great power that a prosecutor wields and the need

25  to exercise discretion and exercise justice.

1          And I take that seriously, Judge, and in making

2     and entering into plea agreements, I take that seriously.

3     There is the one side, and there is a great cost going to

4     trial.  There is a great cost to the taxpayer.  There is a

5     great cost to the Defendant.  There is a great cost to the

6     witnesses.  That all has to be factored in.

7          THE COURT:  I'm not sure who the person is you

8     have in mind.  Attorney General Jackson back in the early

9     30s's, I think it was, made such a speech.

10          MR. BOWMAN:  That may be it, Judge.

11          THE COURT:  He, of course, later went on to the

12     Supreme Court.  But, anyway.

13          All right, Mr. Bowman, thank you.

14          Anything else, Mr. Fabus?

15          MR. FABUS:  No, Your Honor.

16          THE COURT:  All right, gentleman, obviously I am

17     going to take this matter under advisement, and I will issue

18     a written opinion here.

19          You know I have had to deal with these things

20     numerous times over the years and when I think about them

21     one case always comes to mind, and it was not my case.

22          It was a case early on in my career where a

23     Defendant entered a guilty plea.  Then became dissatisfied

24     with his lawyer, hired a new one, ultimately convinced the

25     Judge to allow him to withdraw from that plea agreement

1   under which he would have received 20 years or less.  He

2   ended up with a mandatory life sentence, and he was a young

3   man.

4           The list that is identified in the case law is a

5   non-exclusive list, but I doubt if it is an appropriate

6   matter for me to consider the best interests of the

7   Defendant.

8           I suppose that is best left to a higher power who

9   is said to look after fools and drunks.

10          The easiest thing for me to do, Mr. Dishner, is

11  grant your Motion, and set this case for trial.  But I share

12  the same fear, frankly, that Mr. Fabus fears, and that is

13  that you are marching down the road to a non-parolable life

14  sentence.

15          Mr. Fabus, you are CJ appointed, so would you

16  order the transcript of today's hearing for me.  And I have

17  read through as we have been doing this today the

18  transcript, the sealed portion of the transcript, from

19  November the 17th.  I am not sure there is anything in that

20  that divulges defense strategy or is privileged information,

21  but would you please review that with Mr. Dishner.

22          Let me know, say within ten days -- that is

23  probably going to end up on a weekend -- let's say a week

24  from next Monday, whether or not there is any objection by

25  Mr. Dishner to the unsealing of that portion of the

1  transcript.

2          If there is none, just file it with a simple

3  statement that says that there is no objection to it.

4  Otherwise, tell me in a sealed filing what the objections

5  are.

6          Does anybody foresee the need for a potential

7  additional briefing after those transcripts are either

8  unsealed or filed?

9          MR. BOWMAN:  I do not, Your Honor.

10         MR. FABUS:  I don't either, Judge.

11         THE COURT:  All right.  Once the transcript from

12  today's hearing is filed, I will go forward with a decision

13  on the Motion.

14         And Mr. Dishner, we will get that to you as

15  quickly as possible.  If you are not going to be permitted

16  to withdraw your guilty plea we need to move on to

17  sentencing as quickly as possible.

18         If you are, we need to set the case for trial as

19  quickly as we can.  All right.  Thank you all very much.

20  Let's adjourn for the day.

21         THE COURTROOM DEPUTY:  All rise.  This Honorable

22  Court now stands adjourned.

23      (End of proceedings.)

24

25

REPORTER'S CERTIFICATION

STATE OF TENNESSEE      )

COUNTY OF KNOX          )

     I, Jill M. Waggoner Zobel, LCR #692, CVR, Court Reporter and Notary Public, in and for the State of Tennessee, do hereby certify that the above Proceeding was reported verbatim through the use of the voice-writing method and thereafter transcribed by me, and that the foregoing 105 pages of the transcript is a true and accurate record to the best of my knowledge, skills and ability.

     I further certify that I am neither kin nor of counsel to any of the parties, nor in any way financially interested in the outcome of this case.

     I further certify that I am duly licensed by the Tennessee Board of Court Reporting as a Licensed Court Reporter as evidenced by the LCR number and expiration date following my name below.

     IN WITNESS WHEREOF, I have hereunto set my hand and affixed my Seal this 15th day of June, 2018.

Jill M. Waggoner Zobel, LCR #692
Expiration Date 6/30/20
N.P. Commission Expires: 8/22/19
Miller & Miller Court Reporters
12804 Union Road, Knoxville, TN 37934
Phone: 865-675-1471/FAX: 865-675-6398
Email: JMccon3590@aol.com